## No. 12,324.

### TISDEL ET AL. *v.* CENTRAL SAVINGS BANK AND TRUST COMPANY.

(6 P. [2d] 912)

Decided December 28, 1931.

Mr. C. D. TODD, Mr. THOMAS A. NIXON, for plaintiffs in error.

Mr. S. E. MARSHALL, Messrs. LEWIS & GRANT, for defendant in error.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

C. B. TISDEL, T. T. Wilson and Eugene R. Gooden, plaintiffs in error, will hereinafter be referred to as defendants; the Central Savings Bank and Trust Company, a banking corporation, doing business at Denver, Colorado, as plaintiff, and the Northern Bank and Trust Company, a banking corporation, doing business at Greeley, Colorado, as the trust company. Plaintiff recovered judgment in the sum of $48,889.92 and costs against defendants and others upon their promissory note. The trial court having granted plaintiff's motion for a directed verdict, defendants prosecute this writ assigning as error the granting of the motion and the rendering of judgment thereon.

The complaint alleges that plaintiff is the owner and holder of defendants' promissory note in the sum of $59,290.28, dated January 5, 1924, which note is secured by collateral; that through the sale of the collateral and payments, the principal thereof has been reduced to $41,616.68, which sum, with interest thereon, is the amount for which plaintiff seeks judgment.

The answer, for a first defense, admits the signing of

the promissory note and the attempted sale of the collateral securing the same, but alleges that plaintiff unlawfully and illegally retains the collateral; denies the indebtedness and each other allegation of the complaint. The further allegation is made that defendants and others on June 1, 1922, made their promissory note, with plaintiff as payee therein, for the sum of $85,000, which note was renewed on April 5, 1923, for the sum of $57,-534.81, which was the amount then due on the original note, which last note was, on January 5, 1924, renewed for the unpaid balance due thereon by the note herein sued upon; that one Owens was, prior to May 16, 1922, indebted to plaintiff in the sum of $93,216.60, which indebtedness was evidenced by a promissory note, dated June 1, 1921, and which was secured by a duly recorded chattel mortgage on cattle and other livestock. The Owens note and chattel mortgage securing the same, on May 16, 1922, was in full force and effect by reason of extensions thereof legally made by plaintiff. Defendants and others were directors of the trust company, and, during May, 1922, it was found that the trust company's financial condition was impaired to such an extent that it could not longer continue in business without financial assistance, for which assistance it applied to plaintiff.

Defendants further allege that plaintiff, through its president, one Cockins, and its cashier, one Smith, proposed to defendants and other directors of the trust company that if an assessment of 100 per cent was levied upon the capital stock of the trust company, and one Shumeker was elected as a director and cashier of the trust company, and was placed in active charge of its affairs, and, if defendants and others would sign a promissory note in favor of plaintiff for the entire amount of the Owens indebtedness due plaintiff, that plaintiff would refinance the trust company by loaning it sufficient funds with which to carry on its banking business, and plaintiff would cause to be paid or would pay all delinquent assessment levied upon its bank stock, and,

also, that Smith, cashier of plaintiff, would become a director of the trust company. Defendants allege that they fully performed every condition imposed by plaintiff, upon their part to be performed, notwithstanding which, plaintiff utterly failed and refused to perform and carry out the conditions of its proposal. Defendants further allege that their promissory note was delivered to plaintiff conditionally upon the full performance of plaintiff's proposal, and not otherwise, and because of the failure and refusal of plaintiff to perform and fully comply with the terms and conditions of its proposal, the promissory note never became a binding obligation of defendants. Defendants further allege that the renewals of their original promissory note were made by them upon the same terms and conditions as contained in the original proposal of plaintiff, which plaintiff never performed, and, that in making the renewal notes, defendants did not intend to, and did not, waive any of the conditions upon which the original note was signed.

Defendants, for a second defense, while admitting the making of the promissory note, allege that one Cockins, acting for and on behalf of the plaintiff, obtained defendants' signatures thereon by false and fraudulent representations respecting the security for the Owens note, in that plaintiff represented that the Owens note was secured by a chattel mortgage on a certain number of high grade and pure bred cattle and other livestock, all of which security was represented to be intact and worth an amount in excess of the note for which it was given as security; that if defendants would make and deliver their promissory note in the sum of $85,000, with plaintiff as payee therein, it, plaintiff, would hold the same as collateral security for the Owens indebtedness, and plaintiff would, if necessary, sell the Owens security for an amount sufficient to discharge the Owens indebtedness in full, without loss to defendants by reason of their promissory note given as collateral security. Defendants allege that the representations of plaintiff with reference to the

number, grade and value of the cattle and other live-stock securing the Owens indebtedness were false and untrue, and so known to be by plaintiff; that it was a material representation made by plaintiff to defendants to induce defendants to give their promissory note; that defendants believed the representations of plaintiff to be true and relied thereon to their damage, and that defendants did not intend to, and did not, waive any defense of false and fraudulent representations in making the renewal notes hereinbefore mentioned.

Defendants, for a third defense, allege that the obligation and liability of some of the joint makers of the note herein sued upon were fully settled, discharged and satisfied, and certain joint makers fully released from all liability, and that by reason thereof, defendants are fully released and discharged from all liability on said note.

Defendants, for a fourth defense, allege a total want of consideration for the original and renewal notes because of plaintiff's failure to comply with the conditions upon which the same were executed and conditionally delivered.

Defendants, for a fifth defense, allege a failure of consideration for the original and renewal notes because of the nonfulfillment, on plaintiff's part, of the terms and conditions upon which the same were executed and conditionally delivered.

Defendants, for a sixth defense, allege a want of consideration for the original and renewal notes because of plaintiff's false and fraudulent representations.

Defendants, for a seventh defense, allege that, by sale of the collateral attached to the original and renewal notes, plaintiff realized a sum in excess of the amount of the Owens note, endorsed by the trust company without recourse, upon which defendants were liable as guarantors, and with this amount so credited upon the note sued upon, there would be an entire failure of consideration for any balance due upon the promissory note involved in this action.

Defendants, for a cross-complaint, allege that through the failure, refusal and neglect of plaintiff to fully carry out the terms and conditions of its agreement to refinance the trust company, and other things by it to be done, as set forth in the first defense, the entire value of their stock in the trust company and all assessments paid thereon were a total loss to defendants, for which loss, together with the collateral deposited by each defendant, each defendant seeks to recover judgment.

Defendants, for a second cross-complaint, allege that by reason of the false and fraudulent representations of plaintiff, each lost the entire value of his stock in the trust company, as well as assessments paid thereon, and the collateral given to secure their original and renewal notes given plaintiff, for which each seeks to recover judgment.

The replication to the answer and answer to the cross-complaint may be treated as general denials.

The evidence disclosed that defendants and others were officers, directors and stockholders of the trust company which had a capitalization of $50,000 with a surplus of approximately $15,000; and, under the provisions of section 2688, C. L. 1921, the maximum loan authorized to any individual, firm or corporation was $13,-000. One Owens was a heavy borrower from the trust company, and the amounts loaned him by the trust company, directly and indirectly, in the aggregate, greatly exceeded the amount which the trust company was authorized to loan an individual, so that the trust company, in order to accommodate Owens and other borrowers, and to engage in this profitable business, as it thought, entered into an agreement with plaintiff for the discounting of some of its notes, the agreement being as follows:

"Guaranty

"Whereas, the undersigned stockholders of the Northern Bank and Trust Company of Greeley, Colorado, desire that the Central Savings Bank & Trust Company

of Denver, Colorado, shall purchase from time to time, as may be offered it, certain notes mostly secured by mortgages on land, cattle, or other livestock; said notes' and mortgages to be drawn payable to the order of any of the undersigned or to the order of the Northern Bank & Trust Company and to be endorsed by said bank without recourse. Now, therefore, as an inducement to the said the Central Savings Bank and Trust Company to buy said notes and in consideration of the sum of $1.00 to them in hand paid, the receipt whereof is hereby acknowledged, the undersigned hereby jointly and severally guarantee to the said, the Central Savings Bank & Trust Company, the payment of all such notes which may be sold to the said the Central Savings Bank and Trust Company at the maturity of the said notes or at the maturity of an extended period thereof, which extension may be made with or without our request. Presentation for payment, notice of non-payment and protest are each expressly waived.

''The liability of the undersigned, however, shall at no time exceed the sum of two hundred thousand dollars.

''Dated at Greeley, Colorado, this 3rd day of January, 1921.

''E. L. Carson,
''C. B. Tisdel,
''W. R. Patterson,
''Albert F. Eaton,
''N. D. Bartholomew,
''E. R. Gooden,
''T. T. Wilson.''

The guaranty was given prior to May, 1922, and prior to the date of the original note for $85,000 given plaintiff by defendants under date of June 1, 1922. The original note was reduced by payments thereon to the sum of $57,534.81, for which amount the defendants and others, on April 5, 1923, executed and delivered their renewal note, which note was again renewed on January 5, 1924,

for the principal sum of $59,290.28, which last sum was reduced by the sale of collateral to $41,616.68, which was the principal amount for which this action was brought. The evidence further disclosed that on May 14, 1922, the trust company was in such financial straits that it could not continue without financial assistance, and appealed to plaintiff for such; in response to which appeal, one Smith, cashier of plaintiff, went to Greeley to attend a meeting of the officers and directors of the trust company. At this meeting, defendants say, Smith promised and agreed that if a $100 assessment was levied upon the capital stock of the trust company, and, if Shumeker was elected an officer and placed in charge of its banking business, plaintiff would refinance the trust company, and he, Smith, would become a director. Shumeker, when offered the active management of the trust company, declined, unless, among other things, the trust company was entirely freed and rid of all liability on the Owens notes and this entire indebtedness taken from under the guaranty of its officers and directors, and the same assumed as a direct personal obligation of the trust company's officers and directors. No arrangement at this time was made with reference to the Owens notes; however, Mr. Shumeker, on the following day, May 15, 1922, assumed the active management of the trust company. At a subsequent meeting, occurring about two days later, some of those liable on the guaranty were present with Mr. Cockins, plaintiff's president; the only questions discussed were an adjustment of the trust company's indebtedness to plaintiff, by reason of its discounting the Owens notes, and the liability of the officers and directors of the trust company, by reason of their guaranty. Nothing definite was done at this meeting with reference to the adjustment, but arrangements were then made for another meeting, to be held about a week later, when all those liable on the guaranty could be present. At this last meeting, Mr. Cockins "demanded a joint note from those whom he claimed were obligated on the Owens

matter, a joint note for the amount," according to defendants' witnesses; and Mr. Cockins definitely stated that the Owens note was in an unsatisfactory condition and some arrangements must be made to take care of it. At this meeting, Cockins also inquired of each one present what additional security he could give for the payment of the new note which he, Cockins, was demanding, and each gave an accurate description of the security he had available, except one Eaton, who refused to sign the note, and thereupon paid the sum of $12,000 to plaintiff, who, at the written request of all the co-guarantors, fully released and discharged Eaton from all liability to plaintiff on account of the guaranty. All of the guarantors, excepting Eaton, agreed to sign a note for $85,000, with plaintiff as payee therein, and, on June 1, 1922, they did so; and thereupon, the Owens note for $93,216.60 was delivered to the guarantors and was produced at the trial by Bartholomew, president of the trust company, one of the guarantors and one of the makers of the $85,000 note.

Notwithstanding the evidence of defendants to the effect that Cockins had assured them that the Owens note was amply secured, and that he would sell the security for an amount sufficient to fully pay the same, so that there would be no liability on the makers of the $85,000 note, they testified that Cockins stated that his bank was dissatisfied with the security for the Owens note and demanded from the guarantors additional security, in addition to the chattel mortgage on the Owens cattle and livestock. Additional security was given by the makers. The $85,000 note was further secured by a chattel mortgage given by Bartholomew to plaintiff on cattle and livestock; and from the chattel mortgage itself, offered in evidence, the cattle and livestock were those formerly owned by Owens and upon which he had executed his chattel mortgage to secure the payment of the $93,216.60 note, although the number of cattle and horses is materially less; and in addition to this security, the individual makers also deposited securities of the face value

of $33,000. The Owens cattle and livestock were taken possession of by Bartholomew, president of the trust company, one of the guarantors and one of the makers of the $85,000 note, who sold them and applied the proceeds to the payment of the $85,000 note, reducing the same to the sum of $57,534.81 on April 5, 1923. There is no evidence whatever that the proposals, terms and conditions of the Smith agreement, as testified to by defendants, were ever referred to by anyone subsequent to the meeting of May 14, 1922. On December 9, 1922, one of the makers of the $85,000 note wrote plaintiff stating that those upon the note had met twice and it was impossible for them to raise sufficient funds with which to pay interest; however, they were able to offer additional security upon 160 acres in Wisconsin and an undivided half interest in 640 acres near Purcell, Colorado.

Except the chattel mortgage on the cattle, which had been sold and the proceeds applied in reduction of the principal, the first renewal note, dated April 5, 1923, was secured by the collateral for the original $85,000 note, and, in addition thereto, the security referred to by Bartholomew who offered additional security in his letter of December 9, 1922, referred to herein. When the first renewal note was given, although it was long past the time when the Owens cattle and livestock had been sold, upon which Bartholomew had given the chattel mortgage, and although plaintiff had failed to refinance the trust company, but had continued as its correspondent and had discounted its securities when offered for that purpose, and although it was then apparent to all the makers that the Owens cattle and livestock were not as represented by Cockins, as they say, the makers, without protest, objection or intimation of any defense, signed and delivered the renewal note. The substance of defendants' evidence in this respect is that at the time of the first renewal, current rumors were that oil had been or might be found on the Owens land, in which event, Owens would or could be made to pay the indebtedness evidenced by his note

of $93,216.60 which belonged to them, and, if this was done, it would mean a clear profit to them of the sum of $12,000 because of the payment made by Eaton for a release on his guaranty.

On January 5, 1924, long after the due date of the first renewal note, defendants executed and delivered to plaintiff the second renewal note which was for the sum of $59,290.28, which renewal note carried with it all the security given by defendants for the first renewal note. In November, 1923, the trust company failed and was taken charge of by the state bank commissioner. The second renewal note, dated January 5, 1924, subsequent to the failure of the trust company, was signed and delivered by defendants and others without complaint, objection or protest, and without mention of any defense whatever, and without any intimation to plaintiff that the makers thereof did not consider it their binding obligation; and when this note fell due and was unpaid, plaintiff sold the collateral therewith, applied the proceeds and brought suit for the balance due.

So far as the record discloses, the first intimation that false and fraudulent representations had been involved in the transaction; that plaintiff had breached its contract or that any of the other numerous defenses or counter-claims were relied upon by defendants, was when the answers herein were filed on June 21, 1926. The record discloses the further evidence, about which there is little, if any, conflict: In March, 1922, plaintiff notified defendants and others liable upon the guaranty that the security for the Owens indebtedness was inadequate, and then suggested that the chattels securing this indebtedness be sold, and the guarantors make some arrangement for the payment of the loss on the Owens note; it also appears that the entire amount of the Owens indebtedness had been deposited by plaintiff to the trust company's account and the proceeds used by the trust company in the conduct of its banking business; it also appears that some of the notes, afterwards consolidated

into the Owens note for $93,216.60, were made payable to the trust company; some to one of its officers; the ones payable directly to the order of the trust company were endorsed by it "without recourse," while the ones payable to its officer were endorsed by him in blank, and all were discounted by plaintiff and the proceeds credited to the trust company. It also appears that plaintiff did not charge the same rate of interest on their discounted securities as specified therein, and that the trust company had the benefit of this differential, and was given credit therefor by plaintiff; it further appears that when the guarantors executed the note for $85,000, they overpaid the plaintiff which thereupon credited the trust company, for the use of Bartholomew and his co-makers, with the sum of $1,778.54; moreover, it appears that in referring to the Owens note, dated June 1, 1921, the trust company, in transmitting it to plaintiff, used, among others, the following words: "Enclosed herein note of C. V. Owens, for $93,216.60, a renewal of notes and interest, that you are carrying for us." It also appears that the $85,000 note bore interest at the rate of 6% per annum from date until paid, while the $93,216.60 Owens note, assigned and delivered to defendants and their co-makers, bore interest at the rate of 8% per annum until maturity, i. e., November, 1921, and thereafter it bore interest at the rate of 12% per annum. In addition, it appears that certain joint makers of the promissory note herein were not released, unless, according to the evidence of defendants, such release was effected by an oral agreement between plaintiff and these certain joint makers. It also appears that if the defendants and others were liable on the guaranty, their liability was lessened rather than increased by the giving of the promissory note herein, because of the payment of Eaton for his release therefrom.

　█　1. Counsel for defendants denominate their first defense as conditional delivery, and in support thereof say that their promissory note for $85,000, dated June

1, 1922, with plaintiff as payee, and all renewals thereof, were delivered conditionally upon (a) Smith's becoming a director of the trust company, (b) plaintiff's paying all delinquent special assessments on the trust company's stock by reason of the special assessments of 100 per cent, and, (c) plaintiff's refinancing the trust company. Defendants' evidence, according to the record, is that Smith, vice president of plaintiff, at defendants' request, attended a meeting with some of the trust company's officials on May 14, 1922, at which he made some "suggestions" with reference to its affairs, among them being that one Shumeker be placed in active charge of the trust company's affairs. There is no evidence whatever that at this meeting Mr. Smith mentioned any indebtedness of the trust company or its officials to plaintiff; but at a subsequent meeting on the same day, Mr. Shumeker, who was then present, required the Owens indebtedness to be taken from the trust company and from under the directors' guaranty, before he would have anything whatever to do with the trust company. The record shows that to this demand of Shumeker, Mr. Smith consented. No mention was made of any note to be given by the guarantors to plaintiff. At a subsequent meeting, occurring within a few days, Mr. Cockins, president of plaintiff, being present, the only matter discussed and for the first time considered, according to the record, was a method of satisfying plaintiff's demands for a note signed by the guarantors in an amount equal to the Owens indebtedness, and each one present was asked for additional security. Subsequently, and within a short time, at another meeting, all those liable on the guaranty being present, it was agreed between Cockins and those present that the $85,000 note should be executed and delivered. At this meeting, it was also agreed that for the payment of $12,000 one Eaton, at the written request of his co-guarantors, should be released. The promissory note for $85,000 was subsequently mailed to Shumeker, at Greeley, Colorado, who was requested to and did ob-

tain the signatures thereto of defendants and their co-guarantors, and, with the additional security of defendants and others, returned it to plaintiff at Denver. The record is silent, however, as to any mention of the alleged agreement with Smith in connection with the giving of the promissory note and additional security. If the alleged agreement with Smith is as testified to by defendants, there can be no possible connection between it and the giving of their promissory note, because they were never mentioned together, and were entirely separate and distinct and entirely disconnected, and therefore no evidence whatever was offered to support the defense of conditional delivery, and there could be no error, so far as this defense was concerned, in directing a verdict.

2. The second defense is false and fraudulent representations alleged to have been made to defendants and their co-guarantors by Cockins respecting the number, grade, and value of the Owens cattle and livestock. This defense, after alleging the false and fraudulent representations, concludes: "That this defendant and the co-makers of the said note were without knowledge of the actual facts and were misled by the false and fraudulent representations aforesaid and were induced by said false and fraudulent representations to sign the said note of date June 1, 1922, and each of the renewals thereof, and defendants and said co-makers relied upon each and every representation so falsely made, and believed each and every thereof, to be the truth, and because of his and their reliance on said false and fraudulent representations, signed said purported promissory note and the renewals thereof on April 5, 1923, and the note set forth in the plaintiff's complaint and not otherwise. That the plaintiff herein had full knowledge of the matters and things set forth in this defense of this answer at the time of the execution of the said note and each of the renewals thereof and this defendant and the co-makers thereof did not know of the false and fraudulent representations as hereinabove set forth. Defendant avers

that said original note, and each of the renewals thereof, aforesaid, were made in reliance upon the false and fraudulent representations herein set forth, and not otherwise, and that by making said renewal notes and each of them, defendant did not intend to waive, and did not waive any of the fraud or fraudulent matters herein contained.'' The promissory note of June 1, 1922, for $85,000 was secured by certain mortgage notes of the makers and, in addition, thereto, recites: ''This note is also secured by chattel mortgage of even date on cattle and horses.'' The chattel mortgage referred to above was acknowledged by Bartholomew, one of the co-makers, on June 3, 1922, and specifies the following chattels: ''558 head of cows three to eight years old; 92 head of two-year old heifers; 18 head of bulls. Said cattle are mostly whitefaces and are all branded * * * [which were the designated brands of C. V. Owens]; 55 head of horses and mares of various ages and colors, all branded * * *.'' In the Bartholomew chattel mortgage, supra, was an authorization to pay all proceeds from the sale of stock, branded as indicated, to the mortgagee. The Owens chattel mortgage securing the $93,216.60 note of June 1, 1921, which was assigned and delivered when the $85,000 note was executed, recited the security as: ''1475 head of high grade and pure bred cattle, more particularly described as follows: * * * 116 head of horses, more particularly described as follows: * * *.''

It is therefore evident from this documentary evidence, and is undisputed, that Bartholomew knew that the cattle and other livestock, specifically mentioned in the Owens chattel mortgage of June 1, 1921, were not intact on June 1, 1922. The defendants testified that some time, a month or so, later than June 1, 1922, they knew that the alleged representations of Cockins, as to the number, grade and value of the cattle and livestock mentioned in the Owens chattel mortgage, were false; notwithstanding which, more than eight months thereafter, they furnished additional security and signed the renewal note

of April 5, 1923, without mentioning the false and fraudulent representations to the payee therein, still "* * * in reliance upon the false and fraudulent representations herein set forth, and not otherwise, * * *." The renewal note of April 5, 1923, does not mention the chattel mortgage on cattle and livestock, for these chattels were sold and the proceeds applied to reduce the $85,000, and were the only payments made on this last mentioned note. The defendants testified that when the renewal note of April 5, 1923, was made, they were unable to pay the original note, and had reason to expect that Owens himself would be able to pay from gas and oil leases upon his property. The security for the renewal note of January 5, 1924, was practically the same as the security for the first renewal note of April 5, 1923.

Assuming that Cockins and Smith made false and fraudulent representations, as testified to by defendants, and that they were actionable, still the record affirmatively discloses that with full knowledge of the falsity of the representations, and with all the material facts respecting the same well in mind, defendants thereafter executed two renewal notes without making any protest, objection or complaint, and all this, notwithstanding their testimony that they were fully aware of the falsity of the representations within sixty days after June 1, 1922, the date of the original note, and also fully aware of the fact that lapse of time had then prevented any possibility of the plaintiff's performance. The first intimation of fraud appears when defendants' answer herein was filed at a date more than four years after the giving of the original note. Defendants, in answer to questions by their counsel, testified that in giving the renewal notes they did not intend to waive their defense of false and fraudulent representations, which we may assume to be correct, and yet the record discloses that this intention was a secret one and was never communicated to anyone until the filing of the answer. The intention to not waive a defense of fraud must be evidenced

130

by what is written or said, or what is done, and the secret intention of one is wholly immaterial. 40 Cyc. 263. When one is induced through false and fraudulent representations to enter into an agreement, upon discovery thereof, he has an election to either rescind, in which event he must tender back that which he has received, or he may affirm the agreement, and maintain his action in damages for deceit, but his election must be promptly made, and when once made, is final. If one elects to affirm the agreement, after full knowledge of the truth respecting the false and fraudulent representations, and thereafter continues to carry it out and receive its benefits, he may not thereafter maintain an action in damages for deceit, because this would constitute a ratification of the agreement and a condonation of the fraud; otherwise, one might, with knowledge of fraud, speculate upon the advantages or disadvantages of an agreement, receive its benefits, and thereafter repudiate all its obligations. See the following authorities: *Auld v. Travis,* 5 Colo. App. 535, 544, 545, 39 Pac. 357; *Tilley v. Montelius Co.,* 15 Colo. App. 204, 207, 61 Pac. 483; *Reynolds v. Hart,* 42 Colo. 150, 154, 94 Pac. 14; *Brown v. Gordon-Tiger Co.,* 44 Colo. 311, 322, 323, 97 Pac. 1042; *Gordon-Tiger Co. v. Brown,* 56 Colo. 301, 311, 138 Pac. 51; *Ponder v. Altura Co.,* 57 Colo. 519, 523 et seq., 143 Pac. 570; *Widman v. Barry,* 63 Colo. 427, 432, 168 Pac. 31; *Van Gilder v. Eagleson,* 66 Colo. 364, 367, 181 Pac. 539; *Lucero v. Life Ins. Co.,* 67 Colo. 322, 325, 184 Pac. 379; *First Nat. Bank v. Navins,* 70 Colo. 491, 492, 493, 202 Pac. 702; *Skidmore v. Broughton,* 74 Colo. 580, 583, 223 Pac. 57; *Lewis v. Carsh,* 79 Colo. 51, 53, 244 Pac. 598; *Emley v. Tenenbone,* 81 Colo. 399, 400, 255 Pac. 627; *Gertner v. Bank,* 82 Colo. 13, 40, 257 Pac. 247; *Elliott v. Brady,* 192 N. Y. 221; *Thorpe v. Cooley,* 138 Minn. 431, 433; *Taylor & Sons v. First Nat. Bank,* 212 Fed. 898, 902, 903; *Harris v. Egger,* 226 Fed. 389, 394; *Erwin v. Jackson,* 22 Fed. (2d) 56, 58; 3 R. C. L. 1106; 12 R. C. L. 411, et seq.; 8 C. J. 444; 27 C. J. 22, et seq.; Joyce's Defenses to Com-

mercial Paper (2d Ed.), Vol. 2, p. 1276; Bower's Law of Waiver, page 71; Daniel's Negotiable Instruments (6th Ed.), Vol. 1, page 302; Bishop on. Contracts (2d Ed.), pages 284, 285.

Defendants' testimony, brought out by questions of their counsel, conclusively establishes that if false and fraudulent representations were in fact made, this defense was waived, and there remained nothing for the jury to determine with reference thereto; therefore, the court did not err in withdrawing this question from the jury.

■ 3. Defendants next contend that they were released from all liability to plaintiff on the original and renewal notes because, they allege, plaintiff had fully settled with and released two co-makers, i. e., Bartholomew and Ramsay. Without conceding that the record warrants the statement that plaintiff had fully settled with and released two of defendants' co-makers, the evidence of the same was oral, and there is no contention that the note was delivered to the person primarily liable thereon. The effect of an oral release of liability on a negotiable instrument has never been passed upon in this state although, by reference to the briefs in *Edmonston v. Ascough,* 43 Colo. 55, 95 Pac. 313, we find the question squarely presented. It is doubtful whether the language of the opinion is sufficient to directly determine the point; however, we do find that other courts, in construing a statute identical with ours (sections 3939, C. L. 1921), have held that oral evidence is inadmissible to establish a renunciation or release. *Baldwin v. Daly,* 41 Wash. 416, 83 Pac. 724; *Pitt v. Little,* 58 Wash. 355, 359, 108 Pac. 941; *Portland Iron Works v. Siemens,* 135 Or. 219, 295 Pac. 463; *Manly v. Beam,* 190 N. C. 659, 130 S. E. 633; *Whitcomb v. Bank,* 123 Md. 613, 91 Atl. 689; *Leask v. Dew,* 102 Appellate Div. (N. Y.) 529. See also: 8 C. J. 615, 616; 3 R. C. L. 1270; Daniel on Negotiable Instruments (6th Ed.), §1290; Joyce's Defenses to Commercial Paper (2d Ed.), §998.

Oral evidence being inadmissible to establish a renunciation and release, there was nothing in this defense requiring its submission to the jury.

4-5. We have determined that the note herein sued upon was not conditionally delivered, consequently the fourth and fifth defenses, which are based upon plaintiff's alleged failure to comply with the terms and conditions upon which the note was conditionally delivered, and upon the nonfulfillment of the terms and conditions upon which the same was conditionally delivered, need not further be discussed.

■ 6. The sixth defense alleges a want of consideration for the original note and renewals thereof, because of the alleged false and fraudulent representations of plaintiff. Defendants alleged the original note and renewals thereof were given in full reliance upon the truth of the false and fraudulent representations, but at the trial clearly abandoned this allegation, so far as the renewal notes were concerned. Defendants also alleged, and assumed the burden of proving, non-waiver of this defense. No estoppel was pleaded by plaintiff, and if defendants had been confined strictly to the proof of their allegations, evidence of an estoppel would have been inadmissible; however, both parties permitted evidence of estoppel to enter the trial, without specific objection thereto because the same had not been pleaded, and, under our decisions, we have held that a defeated party cannot complain. *Gillette v. Young,* 45 Colo. 562, 566, 101 Pac. 766; *Divine v. George,* 63 Colo. 341, 345, 346, 166 Pac. 242; *Gillett v. Moore,* 74 Colo. 484, 496, 223 Pac. 21.

■ 7. The seventh defense is based upon the fact that the sale of the collateral, attached to the original note hereinbefore mentioned, was sufficient to fully pay and discharge all of the notes discounted by the trust company to plaintiff and for which defendants were liable under their guaranty. This may be true, and yet it is wholly immaterial. The evidence clearly establishes that as a result of a conference respecting the liability of

defendants and their co-guarantors, it was agreed that the original note herein should be executed, and this was done. At this conference, neither defendants nor their co-guarantors questioned their liability for the entire amount of the Owens indebtedness, as evidenced by his note for $93,216.60; and at this conference, one of the guarantors, refusing to sign a note to plaintiff for the entire amount of the Owens indebtedness, was released, not because it was not covered by the guaranty, but because he wanted to liquidate his liability thereon; his co-guarantors requested in writing that plaintiff release this refusing guarantor upon the payment of $12,000, which amount was paid and the co-guarantor released. It is undisputed that upon the delivery of the original note for $85,000, plaintiff delivered to one of the makers thereon, the Owens note for $93,216.60 secured by chattel mortgage. If there had in fact been any dispute as to defendants' liability for the entire amount of the Owens indebtedness, defendants, having settled that by executing and delivering to plaintiff their note, would not be permitted to now question the amount thereof; it would have been the settlement of a disputed claim which itself is sufficient consideration.

8. There were no disputed questions of facts, material and competent herein, requiring the submission of the case to the jury, and the court did not err in directing a verdict on the complaint and defenses thereto. The cross-complaints herein are based upon the validity of some one or more of the defenses herein, and those defenses having been held insufficient under the evidence offered in support thereof, the cross-complaints must also fail.

Judgment affirmed.