The UNITED STATES of America, Plaintiff,

v.

Abe BERNSTEIN, Morey Bernstein, Sam Bernstein, Bernstein Bros. Pipe and Machinery Company, a Corporation, Maurice Levy, Rose Levy, Albert Bensik, and Modern Specialty Distributors, a partnership, Defendants.

Civ. A. 3088.

United States District Court
D. Colorado.

Feb. 20, 1957.

Findings of Fact and Conclusions of Law March 18, 1957.

Donald E. Kelley, U. S. Atty. for the Dist. of Colorado, Herbert M. Boyle, Asst. U. S. Atty. Denver, Colo., E. Leo Backus, and Frederick L. Smith, of counsel, Dept. of Justice, Washington, D. C., for the United States.

Grant, Shafroth & Toll, Morrison Shafroth, and Frank H. Shafroth, Denver, Colo., for defendants.

KNOUS, Chief Judge.

The plaintiff instituted this action by filing a complaint charging the defendants with having engaged, in violation of the Surplus Property Act of 1944, 50 U.S.C.A. Appendix § 1611 et seq., in a fraudulent trick, scheme, or device for the purpose of obtaining, or aiding in obtaining surplus property from the War Assets Administration.

The case was tried to the Court and thereafter briefs were submitted by the parties.

On plaintiff's motion, at the conclusion of its case the action was dismissed as against the defendant Abe Bernstein.

■ As to the defendant Rose Levy, the Court is of the opinion that the Government has failed to produce sufficient evidence to establish any participation by her in the alleged fraudulent trick, scheme or device, or any connection therewith, and accordingly the action will be dismissed as to the defendant Rose Levy.

■ The Court is satisfied from the evidence adduced at the trial that the remaining defendants in the manner and form alleged in the complaint, used, or engaged in, or caused to be used and engaged in a fraudulent trick, scheme, or device for the purpose of receiving or obtaining, or aiding to receive or obtain surplus from the United States, and entered into an agreement, combination, or conspiracy to do the same and as a result of such action were successful in obtaining priority surplus property from the United States to which they were not entitled, all in violation of the Surplus Property Act of 1944 and the regulations promulgated thereunder, as a consequence of which the issue of liability must be resolved in favor of plaintiff.

In the Court's view no helpful purpose would be served by a recital of the evidence, of considerable volume, which impels the foregoing conclusion of liability on the part of the remaining defendants. However, a determination of the amount of the recovery to which the Government is entitled necessitates some analysis of the pleadings and record as well as the pertinent law.

By its original complaint, filed February 28, 1950, the Government alleged the defendants:

"are liable at the election of the United States (and which election the United States hereby makes and asserts) to pay to the United States as liquidated damages, a sum equivalent to twice the consideration agreed to be given to the War Assets Administration for the property obtained."

Computed on this basis the maximum recovery allowable would be $39,912.00.

The defendants, on October 24, 1950, filed their Answer to the Complaint.

On July 3, 1951, the plaintiff filed a Motion for Leave to File Amended Complaint, alleging in part therein:

"that it has, and since the filing of the original complaint, apparently come to the attention of said Department of Justice that the defendants Bernsteins have made a very large profit from the sale of the heaters alleged to have been fraudulently acquired by them; that if the charges in the complaint be established, said Bernsteins will be liable to the plaintiff for said profits, greatly enhancing the amount to be recovered. * * *"

Thereafter, on January 2, 1952, an Amended Complaint was filed by which the Government sought relief by praying for the restoration of the merchandise or for damages for the cash returns or proceeds of the sale. Damages were also sought in the amount of twice the consideration paid the plaintiff for the merchandise. Answer was made to this Complaint March 10, 1953.

Thereafter, on April 16, 1954, the plaintiff filed a Motion to Amend the Complaint again. The motion was granted, and by its Second Amended Complaint the plaintiff sought, in effect, three forms of relief, viz.:

1. Restoration of the property or the cash returns or proceeds of the sale of the property;

2. Twice the consideration paid the plaintiff for the merchandise;

3. $2,000 plus twice the amount of damages which the plaintiff might have sustained in the sale.

Answer was made to this Complaint October 6, 1954. On the same date the defendants filed their Motion to Compel Election in Accordance with Original Complaint. This Motion was denied by Order of March 1, 1955, which also ordered the Government to elect upon one mode of relief. On April 29, 1955, the Government elected the following:

"That judgment be entered in its favor against defendants for restoration to the United States of the aforementioned property; and with respect to any articles which have been resold under circumstances making return impossible, judgment for the proceeds of such sales, less the amount paid the plaintiff, together with interest and costs."

The Amended Answer to Second Amended Complaint, filed February 27, 1956, set forth as a defense the election by the plaintiff made in its original complaint.

By 40 U.S.C.A. § 489, those committing such violations as are the subject of this action:

"(1) shall pay to the United States the sum of $2,000 for each such act, and double the amount of any damage which the United States may have sustained by reason thereof, together with the cost of suit; or

"(2) shall, if the United States shall so elect, pay to the United States, as liquidated damages, a sum equal to twice the consideration agreed to be given by the United States or any Federal agency to such person or by such person to the United States or any Federal agency, as the case may be; or

"(3) shall, if the United States shall so elect, restore to the United States the money or property thus secured and obtained and the United States shall retain as liquidated damages any property, money, or other consideration given to the United States or any Federal agency for such money or property, as the case may be."

The plaintiff, apparently made its election under 40 U.S.C.A. § 489(d) which provides:

"The civil remedies provided in this section shall be in addition to all other criminal penalties and civil remedies provided by law,"

for it is stated on page 3 of the Government's brief:

" * * * plaintiff * * * elected to proceed under the common law (and) or equitable count. * * *"

■ The theory of the Government seems to be that 40 U.S.C.A. § 489(d) provides remedies known to the common law and/or equity and, thus it proceeds on the proposition that there arose a constructive trust upon the fraudulent vendee and that, therefore, the plaintiff vendor is entitled to the doctrine of "pursuit of trust funds." Whatever difficulty there may be in the first instance in interpreting the phrase "provided by law" as it appears in 40 U.S. C.A. § 489(d), or in the second instance the ability of the plaintiff to sufficiently identify the trust funds, is made immaterial by the fact that it must be held that the plaintiff elected its remedy in its original complaint by seeking "a sum equivalent to twice the consideration agreed to be given to the War Assets Administration for the property obtained. * * *"

It is said in 18 Am.Jur., Election of Remedies, § 3, pg. 129, that:

"An election of remedies may be defined as the choosing between two or more different and coexisting modes of procedure and relief allowed by law on the same state of facts.

The doctrine is applicable where an aggrieved party has two remedies by which he may enforce inconsistent rights growing out of the same transaction and, being cognizant of his legal rights and of such facts as will enable him to make an intelligent choice, brings his action by one of the methods. Under such circumstances, the law says he shall not thereafter adopt the alternative remedy, for a suitor cannot pursue a remedy which predicates his case upon one theory of right and thereafter seek a remedy inconsistent with such prior proceeding * * * "

■ It is clear that the doctrine applies to the Government, albeit, in some instances, with caution. United States v. Oregon Lumber Co., 1922, 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261; Vestal v. Commissioner of Internal Revenue, 1945, 80 U.S.App.D.C. 264, 152 F.2d 132; Goldstein v. United States, 8 Cir., 1955, 227 F.2d 1.

One of the most frequent applications of the doctrine is where a litigant seeks to affirm or disaffirm a contract or transaction and later seeks to disaffirm or affirm the same contract or transaction. Cf. Minneapolis National Bank of Minneapolis, Kan. v. Liberty National Bank, 10 Cir., 1934, 72 F.2d 434; Sylvania Industrial Corporation v. Lilienfeld's Estate, 4 Cir., 1943, 132 F.2d 887, 145 A.L.R. 612; Walker v. L. Maxcy Inc., 5 Cir., 1939, 103 F.2d 24, certiorari denied 308 U.S. 564, 60 S.Ct. 76, 84 L.Ed. 474; Plymouth Village Fire District v. New Amsterdam Cas. Co., D.C.N.H., 1955, 130 F.Supp. 798; Sanders v. Meyerstein D.C.N.C.1954, 124 F.Supp. 77; Tisdel v. Central Savings Bank & Trust Co., 1931, 90 Colo. 114, 6 P.2d 912; Holscher v. Ferry, 1955, 131 Colo. 190, 280 P.2d 655, 28 C.J.S., Election of Remedies, § 6, p. 1070.

In this instance the Government, by its original complaint sought to affirm the transaction by seeking liquidated damages as provided by the statute. By its subsequent election, it sought to disaffirm the transaction by seeking restoration of the property or the proceeds of its sale where return was impossible.

■ It must, however, be recognized as a general rule that an original complaint will not constitute an election precluding a prayer for an inconsistent remedy in an amendment. 28 C.J.S., Election of Remedies, § 20, p. 1096.

However, if the doctrine of election of remedies is not applicable here, it would be hard to conceive of an instance where it would be. Its application does not have to be found in inference or interpretation, for the Government positively stated in its original complaint that it was making and asserting its election. That was done on February 28, 1950. The transactions complained of took place in late 1946. The investigation of the transaction by the War Assets Administration was initiated in February, 1947. During the month of February, 1947, Mr. Poyen, the investigator, ascertained that Mr. Bensik had obtained a loan from Mr. and Mrs. Levy for the purchase of the heaters and that he had sold 510 of the heaters to the Bernstein Brothers Pipe and Machinery Company for $35.00 each. Mr. Bensik disclosed a mark-up that indicated he was planning to sell some of the heaters at $425. He told Mr. Poyen that he had sold a few at prices in excess of $200. As early as December 26, 1946, the Bernsteins were offering the heaters in a national trade magazine for $330.

With these facts attending it is inconceivable that the Government was not appraised of the profits which the Bernsteins were making or could make on the resale of the heaters. The election which they did make on April 29, 1955 could have been made in the original complaint, and if it was to be made at any time should, in good conscience, have been made then.

To overcome their positive election in the original complaint the Government advances the following:

(a) That the matter has already been to the defendants on their motion to comlitigated when the Court ruled adversely

pel the Government to elect as in its original complaint. The answer to this is that the defense of election of remedies is an affirmative defense to be pleaded in answer. Kuhl v. Hayes, 10 Cir., 1954, 212 F.2d 37; Bagwell v. Susman, 6 Cir., 1947, 165 F.2d 412. Moreover, the Government's motion to strike from the Amended Answer to Second Amended Complaint the defense of election of remedies on the ground that it had already been litigated, was denied.

(b) That as a matter of public policy the doctrine should not be applied in this case. The answer to this is that the very remedy which the Government sought and elected upon in its original complaint was one of the remedies which Congress must have deemed a vindication of public policy for violations of the Act. To restrict the Government then to a remedy of their own choosing, which remedy is in fact a vindication of public policy, could hardly be conceived as being in derogation of public policy.

(c) That there was no reliance by the defendants on the original remedy sought and that there was no substantial damage to them as a result of the last election.

Using the Government's own figures (as appearing in their brief) in regard to this matter, they evidence that prior to the original complaint the defendants had sold a quantity of the heaters and parts for $96,677.28, constituting 69 per cent. of the total gross return. Between the original complaint and the filing of the motion to amend the complaint, July 3, 1951, the defendants sold $10,935 worth of heaters and parts, and that thereafter they sold $33,541.96 worth. The last heater was sold in March, 1955. [The final election took place in April, 1955].

From these facts the Government concludes that the sales prior to the filing of the original complaint in 1950 are immaterial. It is then stated that due to the motion of the Government filed July 3, 1951, to amend the complaint, which motion alleged that the Government had been appraised of the fact that the Bern-

steins had made a very large profit on the sale of the heaters and that if fraud were established the defendants would be liable to the Government for such profits, that the defendants were given notice of the Government's intention to seek such profits, but continued to sell the heaters thereafter, so that their only damage would be their business or selling expenses relative to the sale of $10,935 worth of heaters between the original complaint and the filing of the motion to amend.

However, when the amended complaint was in fact filed on January 2, 1952, the Government did not elect but incorporated a prayer for both forms of relief, proceeded in the same manner in its second amended complaint, and elected on April 29, 1955, only after court order to do so.

Thus, it is contended by the Government, after having followed a practice of burning the candle at both ends for a period slightly short of four years, that the defendants should be penalized for failing to guess which mode of relief the Government would finally adopt and during the entire period curtail their business in selling slow-moving merchandise accordingly. Suffice it to say that there appears in the record ample damage to the defendants upon which the doctrine of election of remedies may rest.

The Government, having made a positive election, by its own statement in its original complaint, should now be bound by such election, and be limited to damages in the amount of $39,912 plus costs. Accordingly, it is

Ordered that within thirty (30) days from this date counsel for plaintiff prepare and serve findings of fact and conclusions of law and judgment in conformity herewith. If stipulation as to the form thereof cannot be reached, settlement may be submitted to the Court on notice.

### Findings of Fact and Conclusions of Law

The above-entitled cause having come on for trial before the Court, without a

jury, on the 20th day of August, 1956, a trial by jury having been waived by the parties, and the Court having considered the pleadings, the evidence, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, to wit;

### Findings of Fact.

1. This is a civil action brought by the United States of America as plaintiff under Section 1345 of the Judicial Code, 28 U.S.C. § 1345, and Section 26 (b) of the Surplus Property Act of 1944, 58 Stat. 765, 50 U.S.C.A.Appendix, § 1635(b), of which the Court has jurisdiction under Section 26(c), 50 U.S.C.A. Appendix, § 1635(c) (repealed and re-enacted as Section 209(b) and (c) of the Federal Property and Administrative Services Act of 1949, 63 Stat. 392, 399, 40 U.S.C.A. § 489(b) and (c) ).

2. The defendant Bernstein Bros. Pipe and Machinery Company was at all times herein pertinent a Colorado corporation engaged in the pipe and machinery business, with its principal offices located in Pueblo, Colorado.

3. At all times herein pertinent, the individual defendants Bernstein were officers, directors and co-owners of the company, defendant Maurice Levy was an executive employee in said company, defendant Rose Levy is, and was, the wife of the said Maurice Levy, and sister of defendants Sam and Abe Bernstein; defendant Albert Bensik was an employee of the company in the capacity of salesman; defendant Modern Specialty Distributors was a business enterprise organized by defendant Albert Bensik and engaged in the mail order business.

4. During the fall of 1946, pursuant to the Surplus Property Act of 1944, as amended, and Rules and Regulations promulgated thereunder, the United States, acting through the War Assets Administration, was engaged in the disposition of surplus property at San Antonio, Texas; pursuant thereto, on or about October 31, 1946, the War Assets Administration announced Special Offer No. 58 for the sale of 928 heaters manufactured by the Herman Nelson Corporation, and 3,341 heaters manufactured by the Stewart-Warner Corporation; the offer contained the following provision:

> "This property is offered concurrently to all priority groups, including veterans of World War II and all levels of trade on a Sealed Bid basis. Priority groups will bid without indicating a price, and awards will be made to priority groups at the lowest acceptable price."

The offer recited that sealed bids would be received until 5:00 p. m., November 20, 1946, and opened publicly at 2:00 p. m., November 21, 1946, at the San Antonio Regional Office, Texas.

5. Among those bidding for the heaters were the defendant Bernstein Bros. Pipe and Machinery Company, which bid on all 4,269 heaters, the Herman Nelson Corporation, which bid upon the 928 Herman Nelson heaters, and defendant Albert Bensik, who bid for $20,000 worth of heaters without specifying the category. The high bids received were $33.26 per unit on the Herman Nelson heaters, $22.37 on the Stewart Warner heaters, both of which were submitted by Bernstein Bros. Pipe and Machinery Company. On December 10, 1946, the sale was consummated and awards made. Albert Bensik, on the basis of his veteran's priority, the details concerning which will be treated below, was awarded 600 of the Herman Nelson heaters at $33.26 per unit, or at a total purchase price of $19,956. The remaining heaters of the original 928 were awarded, initially, 282 to defendant Bernstein Bros. Pipe and Machinery Company, and 45 to one Harry P. Cohen. The Herman Nelson Corporation, however, which as aforesaid, was also a bidder for the heaters and which held a small business priority, protested the award of 282 heaters to the Bernstein Bros. Pipe and Machinery Company, which had no priority whatsoever. Following the protest, the said 282 heaters were re-awarded to the Her-

man Nelson Corporation. The initial award to Bernstein Bros. Pipe and Machinery Company, the protest and the re-award all occurred upon the same day, December 10, 1946.

6. In connection with the concurrent sale of the 3,341 Stewart Warner heaters, which are not in issue in this case, all except 510 of said heaters were claimed by and awarded to veterans holding priorities at $22.37 per unit. The remaining 510 heaters were sold to Bernstein Bros. Pipe and Machinery Company, also at $22.37 per unit.

7. Immediately after the award of the 600 Herman Nelson heaters to defendant Bensik, the said heaters were shipped to Modern Specialty Distributors, c/o American Warehouse, Pueblo, Colorado, which warehouse was owned by the defendant Bernstein Bros. Pipe and Machinery Company and wherein defendant Bensik had previously rented some space. Shipping arrangements were handled by defendant Sam Bernstein, who was in San Antonio, Texas, at the time, and the freight costs were borne by the defendant Bernstein Bros. Pipe and Machinery Company. Subsequently, Bernstein Bros. Pipe and Machinery Company billed Bensik for the freight cost allocable to 90 Herman Nelson heaters, which, as will be explained later, were retained by the said Bensik.

8. In connection with defendant Bensik's certification as a veteran priority claimant, it appeared that Bensik had applied initially for a veterans priority certificate on October 30, 1946. In this application, Bensik requested six Gasoline Engine Driven Federal Compressors, Stock No. 66–C–1175. Later, on November 19, 1946, he cancelled this request, and asked to be re-certified for $25,000 worth of surplus property, including $20,000 worth of "Heating and Ventilating Machines and Equipment, Texas".

9. In the said application, Bensik represented and certified (1) that the property was to be used as initial stock for resale in his merchandising business, the Modern Specialty Distributors, (2) that he was the sole investor in the enterprise, (3) that he had invested $3,000 in the same, (4) that he had a net worth of $45,500, including $28,000 in cash, (5) that he was not a broker, nor would he use the property ordered to operate as a broker, (6) that he was not purchasing the property for the use and benefit of any other enterprise, dealer, broker, merchant or other undisclosed partner or principal, (7) that he would not engage in a "drop sale" in his disposition of the property. On the basis of these representations, Bensik was duly certified by War Assets Administration as a priority purchaser for the equipment in question.

10. Sometime before November 19, 1946, the defendants herein (with the exception of Abe Bernstein, who on motion of plaintiff was dismissed as a defendant at the close of the Government's case, and Rose Levy as to whom the action has been dismissed by reason of insufficient evidence) entered into an agreement, plan, scheme, combination or conspiracy to defraud the United States in connection with the mentioned War Assets Administration surplus sale at San Antonio, Texas, by arranging to have defendant Bensik, who was in the employ of the Bernstein Bros. Pipe and Machinery Company, to apply for a veterans priority certificate for the property in question, ostensibly in his own behalf for use in a business to be conducted by him, but actually in behalf, and for the benefit and advantage of Bernstein Bros. Pipe and Machinery Company, the purpose and object being to enable said company to gain possession and control of priority surplus property, which because of lack of priority, it was not entitled to, or eligible for. To accomplish this purpose, the following means were to be employed:

(a) Defendant Bensik was to make application for a veterans priority certificate for approximately $20,000 worth of surplus heaters then being offered by War Assets Administration at San Antonio, Texas, and to make the necessary and required representations in said application, as more specifically set forth

in Paragraph 9 above, although in fact, and as the defendants well knew, all of the said representations were false and fraudulent.

(b) The $20,000 in funds necessary to complete the purchase was to be supplied to defendant Bensik in the following manner. Defendant Maurice Levy, the $25,000 per year general manager of the Bernstein Bros. Pipe and Machinery Company, was to turn over to his wife, defendant Rose Levy, $20,000 on the basis of a purported loan; the latter in turn was to deliver the said $20,000 to defendant Bensik, also on the basis of a loan.

(c) It was agreed further that the property, immediately upon being awarded to Bensik by War Assets Administration, was to be delivered forthwith to the American Warehouse, Pueblo, Colorado, which was owned by defendant Bernstein Bros. Pipe and Machinery Company; that Bensik would transfer title to approximately 85 per cent of the property to the defendant Bernstein Bros. Pipe and Machinery Company, this to be evidenced by a contract of resale, wherein Bensik was to receive a profit of from 75¢ to $2 per unit.

(d) It was agreed also that Bensik would then use the proceeds derived from the resale to the defendant Bernstein Bros. Pipe and Machinery Company to liquidate the $20,000 loan from Rose Levy, who upon receipt of such amounts would transmit the same to her husband, Maurice Levy, in repayment of the loan from him to her.

(e) As for the 15 per cent of the units to be retained by defendant Bensik, the latter was to dispose of the same in the name of his company, the Modern Specialty Distributors, and that 45 per cent of the profits derived from said resale, were to be turned over to defendant, Rose Levy.

11. The basic purpose of the conspiracy was to enable defendants to circumvent the rules, requirements, restrictions and conditions of the Surplus Property Act, and regulations promulgated thereunder, and to permit defendants to obtain priority surplus property for which they were not eligible.

12. Pursuant to the agreement, plan, combination and conspiracy mentioned in Paragraph 10 above, and in order to effectuate the same, defendants (with the exception of the two defendants as to whom the action has been dismissed) employed all the means, methods, procedures and the courses of action outlined in Paragraph 10(a) through (e) above, and as a result were able to obtain from War Assets Administration 600 Herman Nelson priority surplus heaters to which they were not entitled, and which, except for the deceit, fraud, misrepresenation and corrupt practices employed, they would not have been able to obtain.

13. Pursuant to the conspiracy aforesaid, Bensik transferred to the defendant Bernstein Bros. Pipe and Machinery Company at $35 per unit 510 of the 600 units obtained from War Assets Administration, and retained 90 of said units for use in his own business, the Modern Specialty Distributors. Defendant Bensik received a gross profit of $887.40 on the mentioned 510 units transferred to defendant Bernstein Bros. Pipe and Machinery Company, of which 45 per cent or $399.33 was turned over, pursuant to the agreement or conspiracy, to Rose Levy. Accordingly, Bensik's profit on the 510 units transferred to Bernstein Bros. Pipe and Machinery Company totalled $488.07 or 96¢ per unit. As for the profits derived on the 90 units retained by defendant Bensik and resold in the name of his company, the Modern Specialty Distributors, 45 per cent of the profits totaling approximately $24,000 was turned over to Rose Levy.

14. Defendant Bernstein Bros. Pipe and Machinery Company resold, either in original or cannibalized form, the 510 units transferred to it by defendant Bensik at sums ranging up to $450 per unit and in all received a total gross return thereon of $141,154.24.

15. As a result of the activities above described, defendant Bensik, with the aid, assistance and connivance of, and

pursuant to a conspiracy with, the remaining defendants (with the exception of the two defendants as to whom the action has been dismissed) not only violated his business-use certification, whereby he was enabled initially to obtain the property from War Assets Administration, and upon which War Assets Administration relied, but intended to so violate from the inception, and did so for the purpose and with the objective of defrauding the United States.

16. The Government, by its original complaint, filed February 28, 1950, elected to pursue the remedy set forth under Section 26(b) (2) of the Surplus Property Act of 1944, as amended, which provides for payment by the wrongdoer of a sum equal to twice the consideration agreed to be given by such person to the United States for the property obtained. Computed on this basis the recovery allowable would be $39,912.

17. The Government, by later amendments to the original complaint, purported to expand its claim for relief by seeking to recover the gross proceeds realized by defendants upon resale of the property in question.

However, as appears from the Court's Memorandum of Opinion and Order dated February 20, 1957, since the Government in its original complaint elected to affirm the transaction by seeking the liquidated statutory damages aforesaid, it is bound by such election, and cannot later, in effect, disaffirm the transaction and elect to pursue either return of the property or the gross proceeds derived from resale thereof.

### Conclusions of Law

From the foregoing facts, the Court makes the following conclusions of law:

1. This Court has jurisdiction of the parties and subject matter of this action.

2. That the Memorandum of Opinion and Order of this Court dated February 20, 1957, is made a part of said findings of fact and conclusions of law.

3. That the complaint herein be dismissed with prejudice as to defendants Abe Bernstein and Rose Levy.

4. That the defendants (with the exception of defendants Abe Bernstein and Rose Levy) used or engaged in or caused to be used or engaged in a fraudulent trick, scheme or device for the purpose of receiving or obtaining, or aiding to receive or obtain, surplus property from the United States, and entered into an agreement, combination or conspiracy to do the same, and as a result of such action were successful in obtaining priority surplus property from the United States to which they were not entitled, all in violation of the Surplus Property Act of 1944, and regulations promulgated thereunder.

5. Accordingly, plaintiff, the United States of America, is entitled to recover of and from the defendants (except for the two defendants above-mentioned) jointly and severally, the sum of $39,912, plus costs.