**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 27 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WARDER W. BENNETT, CHARLES
BLALOCK, LEONARD L.
GARRETT, ROBERT HANNAH,
ERNEST HOWARD, JOHN
MCMINIMEE, and JULIA A.
SIMPSON,

      Plaintiffs-Appellants-Cross-
      Appellees,

v.

COORS BREWING COMPANY, a
Colorado corporation,

      Defendant-Appellee-Cross-
      Appellant.

Nos. 97-1195 and 97-1221

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. CIV-95-Z-2574)**

---

K. Preston Oade, Jr.(Richard G. Wilkins and Kelly M. Condon with him on the
briefs), of Holme, Roberts & Owen, LLP, Denver, Colorado for Defendant-
Appellee-Cross-Appellant.

Charles Welton (Alan E. Richman, Stephen J. Hensen, C. Todd Drake, of
Richman & Henderson, P.C., Denver, Colorado, with him of the briefs), of
Denver, Colorado, for Plaintiff-Appellants-Cross-Appellees.

Before **PORFILIO** , **HOLLOWAY** , and **HENRY** , Circuit Judges.

**HENRY** , Circuit Judge.

This case involves identical early retirement and voluntary separation releases signed by the plaintiffs-appellants, Warder W. Bennett, Charles Blalock, Leonard L. Garrett, Robert Hannah, Ernest Howard, John McMinimee, and Julia A. Simpson. The appellants appeal the district court's grant of summary judgment in favor of the defendant-appellee, Coors Brewing Company ("Coors"), on their claims for age discrimination under 29 U.S.C. §621-634, the Age Discrimination in Employment Act ("ADEA"), and their pendent state law claims for wrongful discharge, outrageous conduct, negligent misrepresentation, and fraud. The district court rejected all of the appellants' claims, holding that the appellants had knowingly and voluntarily executed a release of all claims against Coors. In the alternative, the district court held that, even if the releases were invalid due to fraud, appellants ratified the releases because they did not "tender back" their separation benefits before filing suit against Coors. As an ancillary matter, Coors cross-appeals the district court's denial of its contractual claim for attorneys' fees. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm in part and reverse in part.

2

## I. BACKGROUND

### A. Facts

In reciting the facts, we review the record and the inferences therefrom in the light most favorable to the non-moving party. See Sanchez v. Denver Pub. Sch., 164 F.3d 527, 531 (10th Cir. 1998). Appellants were among twenty-eight employees in the security department at Coors. In the summer of 1993, Coors announced that, as part of a work place redesign, Coors would reduce its workforce by 500 employees. To avoid involuntary layoffs, Coors planned to achieve this reduction through voluntary severance and attrition. Coors created two voluntary separation plans: the Enhanced Voluntary Severance Program ("EVSP") and the Enhanced Early Retirement Window ("EERW"). Both the EVSP and EERW were one-time benefits packages offered to qualified employees who volunteered to terminate employment or retire during the election period.

Between August and October of 1993, Coors supplied all eligible employees, including the appellants, with detailed and complete explanations of the EVSP and EERW. Specifically, Coors attempted to inform eligible employees about the plans by providing personalized employee information packets, company-sponsored meetings regarding the plans, a telephone "hotline" for employee questions, and a videotape featuring company executives discussing

3

the voluntary severance and early retirement programs.

As part of the downsizing, eligible employees in the security department were given the option of participating in the EVSP or the EERW. In addition to downsizing, Coors evaluated the possibility of completely outsourcing the security department, a decision that if approved would have eliminated all twenty-eight positions in the department. Appellants were aware of rumors of potential outsourcing in the late summer of 1993, when they were considering whether to accept one of the benefit packages.

On September 20, 1993, in an attempt to control rumors about the outsourcing of the security department, Coors informed employees through its company newsletter that there had been no decision on whether to outsource security. The newsletter stated:

RUMOR: Security has been outsourced.

FACT: Security has not been outsourced. Security, like other areas involved in the General and Administrative Workplace Redesign, is brainstorming and evaluating all kinds of ideas.

Aplts' App., vol. II, at 491. Subsequently, according to the affidavits of the appellants, Coors made two statements regarding the downsizing and potential outsourcing of the security department. See Aplts' App., vol. II, at 684-87. On October 11, 1993, at a meeting attended by the appellants, Coors announced that it intended to eliminate 9.36 full-time employees from the security department.

4

Id. Further, at the same meeting, Coors announced that security was not going to be outsourced at the present time, but that outsourcing would be examined again in six months. Id.

Between September 1 and October 28, 1993, all seven of the appellants accepted either the early retirement or the enhanced severance package. Charles Blalock received a $51,563 lump-sum cash payment in return for his voluntary severance, and Leonard Garrett, John McMinimee and Ernest Howard respectively received $38,640, $33,088 and $24,563 in cash for their voluntary severance. Warder Bennett was paid a $9,944 lump sum for his early retirement, with an additional enhanced payment of $453 per month to him and his spouse for the rest of their lives. Robert Hannah and Julie Simpson respectively received $7,426 and $5,460 in cash at the time of their early retirements, with additional monthly payments of $383 and $501 respectively, continuing for life.

As part of the packages, appellants each signed a "Legal Release and Agreement Not to Sue," which provided, among other things:

> You agree fully and forever to release all of your legal rights and claims against Coors, whether or not presently known to you, including future legal rights and claims, if based on acts or omissions occurring before you deliver this signed Agreement to the Benefits Department, in any way relating to your employment with Coors, including your separation from employment . . . .
>
> You agree that the legal rights and claims that you are giving up include, but are not limited to, all state and federal statutes which protect you from discrimination in employment on the basis of sex,

5

race, national origin, religion, disability and age, such as the Age Discrimination in Employment Act of 1987, . . . as well as all common law rights and claims, such as breach of contract, express or implied, tort, whether negligent or intentional, wrongful discharge and any claim for fraud, omission or misrepresentation concerning the [Early Retirement Window or Enhanced Severance Program].

\* \* \*

You agree that, if you bring any kind of legal claim against Coors that you have given up by signing this Agreement, then you will be violating this Agreement and you must pay all legal fees, other costs and expenses incurred by Coors in defending against your claim.

Aplts' App., vol. I, at 85-98. The releases further advised employees to consult a lawyer before signing the release, afforded a forty-five day period in which to consider signing the release, and established a seven-day revocation period in which employees could revoke their acceptances. See id. By November 5, 1993, the official employment of each of the appellants had terminated as a result of their participation in the programs.

Only days later, on November 10, 1993, Coors posted a "Job Opportunities" bulletin in its in-house news letter, advertising seven openings in the security department. On January 2, 1994, Coors ran an advertisement in the *Denver Post* seeking full-time employees for its security department. As a result of these ads, Coors hired new personnel for the security department. However, the record is not clear on the number of new employees hired or their ages.

Appellants claim that, as a result of the advertisements, Coors hired a total

6

of twelve new security personnel by the end of February, 1994, eleven of whom were under the age of forty and one who was forty-one. <u>See</u> Aplts' Reply Br. at 2. Appellants further argue that Coors continued to hire new employees so that by the end of 1994, Coors had re-hired the security department to approximately the same number of personnel as before the downsizing. <u>See</u> <u>id.</u> at 3 ("Despite Coors' incorrect statement that the Security Department was reduced from 28 employees to 19 employees, the evidence shows that the level of staffing in Security did not materially change."). However, appellants have not presented, and we are unable to find in the record, any "evidence" that shows the level did or did not materially change.

Coors disputes these assertions and explains that any new hiring done in the security department was the result of more employees taking the benefit packages than anticipated or due to the restructuring of the security department. <u>See</u> Aple's Br. at 14. Coors maintains that, as a result of the restructuring, it reduced the number of management positions and increased the number of entry-level positions in the security department. Further, Coors affirmatively states that "employees over the age of 40 were hired by or transferred into the Coors Security Department." Aplts' App., vol. I, at 53. Moreover, Coors claims that it only hired eight new employees so that, by February of 1994, the security department had nineteen employees, "a decrease of nine employees as compared to July 1993

7

-- exactly the reduction that Coors announced in fall 1993." <u>Id</u>. at 66. Coors does not address whether more employees were hired in the Security Department after February 1994. The record does not resolve this factual dispute.

### B. Procedural History

Based on their allegations that new, younger employees were hired to replace them, six of the seven appellants filed charges of age discrimination with the Equal Employment Opportunity Commission (the "EEOC") between September 7 and 16, 1994. Appellant Julie Simpson, however, never filed a charge of discrimination with the EEOC.

On October 18, 1995, the appellants filed the current suit against Coors in Colorado federal district court, alleging that Coors: (1) constructively discharged them in violation of the ADEA; (2) fraudulently and/or negligently induced them to resign from their jobs and sign the releases; (3) wrongfully discharged them; and (4) engaged in outrageous conduct. After considerable discovery, Coors moved for summary judgment on all of the appellants' claims and, citing the releases' provisions regarding the payment of attorneys' fees, also sought to collect all fees it had incurred defending the suit. The appellants also moved for partial summary judgment, requesting that the court hold that their claims arose after they signed the releases. The district court granted Coors' motion for

summary judgment, accepting Coors' argument that all claims were barred under the plain language of the releases. In the alternative, the district court held that the plaintiffs' claims were barred because they did not "tender back" their severance packages before bringing suit. Additionally, the court denied the plaintiffs' motion for partial summary judgment, and denied Coors' motion for attorneys' fees.

## C. Standard of Review

We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court. See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, "we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." See McKnight, 149 F.3d at 1128. If there is no genuine issue of material fact in dispute, we then must determine if the substantive law was correctly applied by the district court. See id.

9

## II. DISCUSSION

In this appeal, we must resolve whether appellants' claims are barred by the terms of the releases they executed upon their separation from Coors. We begin by addressing appellants' claims under the ADEA.

### A.    APPELLANTS' ADEA CLAIMS

#### 1.    Knowing and Voluntary Release Execution

Appellants argue first that the district court erred in holding that the releases, signed by the appellants when they accepted either the EVSP or EERW, were knowing and voluntary under 29 U.S.C. §626, the Older Workers Benefit Protection Act ("OWBPA"). Specifically, appellants argue that the waivers were not knowing and voluntary because of fraud, duress, and mutual mistake. Coors, however, argues that the releases are valid because they comply with the express requirements of the OWBPA.

Section 201 of the OWBPA prohibits the waiver of ADEA claims if the waiver is not "knowing and voluntary." 29 U.S.C. § 626(f)(1). The statute provides that an ADEA waiver is not knowing and voluntary unless, "at a minimum," it complies with the requirements set out in the statute.    Id. The statutory requirements are summarized as follows:

10

(1) the release must be written in a manner calculated to be understood by the employee signing the release, or by the average individual eligible to participate;

(2) the release must specifically refer to claims arising under the ADEA;

(3) the release must not purport to encompass claims that may arise after the date of execution;

(4) the employer must provide consideration for the waiver or release of ADEA claims above and beyond that to which the employee would otherwise already be entitled;

(5) the employee must be advised in writing to consult with an attorney prior to executing the agreement;

(6) the employee must be given at least 45 days to consider signing if the incentive is offered to a group;

(7) the release must allow the employee to revoke the agreement up to 7 days after signing; and

(8) if the release is offered in connection with an exit incentive or group termination program, the employer must provide information relating to the job titles and ages of those eligible for the program, and the corresponding information relating to employees in the same job titles who were not eligible or not selected for the program.

See 29 U.S.C. § 626(f)(1)(A)-(H).

In the present case, the district court correctly found that the releases complied with these express statutory requirements. However, the statutory factors are not exclusive and other circumstances, outside the express statutory requirements, may impact whether a waiver under the OWBPA is knowing and voluntary.

11

In Torrez v. Public Serv. Co. of N.M., Inc., 908 F.2d 687, 690 (10th Cir. 1990) (per curiam), we held that a court must look to the "totality of the circumstances" to determine if the release of an employment discrimination claim is knowing and voluntary. This approach, adopted by "a majority of circuits," requires that a court "explicitly look beyond the contract language and consider all relevant factors in assessing a plaintiff's knowledge and the voluntariness of the waiver." Id. at 689 (emphasis added).

> In our view, the totality of the circumstances approach is the better one. While evaluation of the language of the contract is necessary to determine the validity of the waiver of discrimination claims, our inquiry cannot end there. Especially "[i]n light of the strong policy concerns to eradicate discrimination in employment, a review of the totality of the circumstances, considerate of the particular individual who has executed the release, is also necessary."

Id. at 690 (emphasis added) (quoting Coventry v. United States Steel Corp., 856 F.2d 514, 522-23 (3d Cir. 1988)). Although Torrez was decided before the 1990 amendments to the ADEA, which includes § 626(f), its requirement that a court look beyond the minimum statutory requirements to the "totality of the circumstances" is consistent with the plain language and the legislative history of the OWBPA.

The OWBPA plainly states that the listed statutory requirements are a minimum for determining whether a waiver is knowing and voluntary. 29 U.S.C. § 626(f)(1) ("a waiver may not be considered knowing and voluntary unless at a

12

minimum . . . " it complies with the listed statutory requirements.). In addition, the legislative history explicitly approves of the logical and plain meaning interpretation that the statutory requirements are not exclusive.

> Title II of the [OWBPA] provides . . . that waivers not supervised by the EEOC may be valid and enforceable if they meet certain threshold requirements and are otherwise shown to be knowing and voluntary . . . .
> . . . The individual [waiving his rights] . . . <u>must have acted in the absence of fraud, duress, coercion, or mistake of material fact.</u> The Committee expects that courts reviewing the "knowing and voluntary" issue will scrutinize carefully the <u>complete circumstances</u> in which the waiver was executed . . . .
> The bill establishes <u>specified minimum requirements</u> that must be satisfied before a court may proceed to determine factually whether the execution of a waiver was "knowing and voluntary."

S. Rep. No. 263, at 31-32 (1990), <u>reprinted in</u> 1990 U.S.C.C.A.N. 1509, 1537 (emphasis added). Accordingly, we must look beyond the specified statutory minimum requirements.

Under general contract principles, it is well established that a contract is void and unenforceable if procured through fraud. <u>See, e.g.</u>, Restatement (Second) Contracts §164(1) (1981) ("If a party's manifestation of assent is induced by a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient"); <u>Shaheen v. B.F. Goodrich Co.</u>, 873 F.2d 105, 107 (6th Cir. 1989) ("Properly executed waivers of possible employment-related discrimination claims knowingly and voluntarily made between an employee and his employer will be

13

enforced absent the typical exceptions for fraud, duress, lack of consideration or mutual mistake."). Applying these principles, we hold that non-statutory circumstances such as fraud, duress, or mutual mistake may render an ADEA waiver not "knowing and voluntary" under the OWBPA.

The Eleventh Circuit reached this same conclusion in Griffin v. Kraft Gen. Foods, Inc. , 62 F.3d 368, 373-74 (11th Cir. 1995). In Griffin , terminated employees sued their former employer under the OWBPA, seeking to invalidate releases of ADEA rights that they were required to sign as a condition of receiving severance benefits. The terminated employees argued that the district court erred when it failed to consider non-statutory factors showing the waiver was not "knowing and voluntary." The Eleventh Circuit agreed, holding that "nonstatutory circumstances, such as fraud, duress, or coercion in connection with the execution of the waiver, may render an ADEA waiver not 'knowing and voluntary.'" Id.

In the present case, as in Griffin , the district court erred by not addressing the totality of the circumstances surrounding the releases. While appellants' claims of fraud, duress and mutual mistake are separate state law claims, they are also inquiries relevant to the issue of whether the waivers were knowing and voluntary under the OWBPA.

After reviewing the record and taking the facts in the light most favorable

14

to appellants, for the reasons discussed below, we conclude that the appellants established a *prima facie* claim of fraud, indicating that the waivers may not have been knowing and voluntary. However, appellants failed to establish a *prima facie* claim of duress or mutual mistake.

### a. Fraud

To establish a *prima facie* case of fraud under Colorado law, a plaintiff must present evidence of the following:

(1) "the defendant made a false representation of a material fact;"

(2) "the party making the representation knew it was false;"

(3) "the party to whom the representation was made did not know of the falsity;"

(4) "the representation was made with the intent that it be acted upon;" and,

(5) "the representation resulted in damages."

Brody v. Bock, 897 P.2d 769, 775-76 (Colo. 1995). As a general rule, actionable fraud cannot consist of unfulfilled predictions or erroneous conjectures as to future events. However, exceptions exist:

> Merely expressing an opinion in the nature of a prophecy as to the happening of a future event is not actionable. However, <u>a promise concerning a future act, when coupled with a present intention not to fulfill the promise, can be a misrepresentation which is actionable as fraud</u>.

15

Ballow v. Phico Ins. Co. , 875 P.2d 1354, 1362 (Colo. 1993) (quotations and citations omitted) (emphasis added) .

Appellants claim that when Coors stated that it intended to downsize the security department by 9.36 personnel, the statement was false and Coors' true intention was to keep the same number of employees. Appellants also argue that when Coors made the statement that outsourcing would be re-evaluated in six months, Coors had no intention of outsourcing or re-evaluating in six months and the decision had already been made not to outsource the security department. Thus, appellants argue, these allegedly fraudulent statements were made either to induce them to take the severance packages or, for those employees who had already signed a release, to insure that those appellants would not revoke their acceptance during the seven-day revocation period required by the OWBPA.

When taken in the light most favorable to the non-moving party, the fact that Coors began to advertise for new employees five days after appellants' official termination date and the allegation that Coors re-hired the security department to approximately the same number as before the downsizing is sufficient on this record to support appellants' allegations and establish a *prima facie* claim of fraud. While appellants' allegations concern future events, appellants argue that, at the time Coors made these statements, Coors knew they were false and had no intention of downsizing or re-evaluating outsourcing. In

16

addition, the actual number of employees re-hired by Coors is in dispute. Contrary to appellants' assertions, Coors claims that it only hired eight new employees, in the end reducing the department by nearly the exact number as it had stated in October of 1993. The issue of fraud as it relates to the knowing and voluntary nature of the waiver (including the disputed number of employees terminated and re-hired by Coors) was not developed in this summary judgment record and, on the factual record to this point, we cannot decide the issue of fraud as a matter of law. We therefore leave it for the district court to consider on remand whether, under the totality of the circumstances, the waiver was valid in light of appellants' allegations of fraud.

### b.    Duress

In addition to fraud, appellants claim that the releases were not knowing and voluntary because they were under duress at the time they executed the releases. Specifically, appellants argue that Coors made "threats" of outsourcing the security department that left appellants with no choice but to accept the severance packages. In support of their claims, appellants have submitted personal affidavits and the opinions of two expert witnesses, Dr. Bebensee and Dr. Pesci. Dr. Bebensee is a senior human resource executive and Dr. Pesci is a licensed counselor who worked with the appellants while they worked in the

security department.  Dr. Bebensee and Dr. Pesci stated that appellants were under "duress" because of the changes and uncertainty surrounding the security department.  These assertions, however, do not establish a *prima facie* case of duress.

In order to establish duress under Colorado law, a party must show an unlawful threat or other improper means, so that the other party's will "was so taken away that he could not properly enter into [the] contract."  Wiesen v. Short, 604 P.2d 1191, 1192 (Colo. Ct. App. 1979).

> To establish duress as ground for the avoidance of a contract, conveyance, or other act, it is not alone sufficient to show the exertion of pressure by threats or even by physical compulsion, but it must also clearly appear that the force or threats employed actually subjugated the mind and will of the person against whom they were directed, and were thus the sole and efficient cause of the action which he took . . . .  And it is a general rule that a transaction cannot be held to have been induced by duress, notwithstanding any threats which may have been made, where the party had and took an opportunity for reflection and for making up his mind, and where he consulted with others and had the benefit of their advice, especially where he was advised by his counsel.

Wiesen, 604 P.2d at 1192 (emphasis added) (quotations omitted).  See also Anselmo v. Manufacturers Life Ins. Co., 771 F.2d 417, 420 (8th Cir. 1985) (holding that the fact that an employee faces a tough decision of either "accepting . . . termination perks or pursuing his legal rights under [an] employment agreement . . . does not mean that [the employee] lacked the requisite free will to make the decision.");  Vail/Arrowhead, Inc. v. District Court for the Fifth Judicial

18

Dist., Eagle County, 954 P.2d 608, 612 (Colo. 1998) ("A contract is voidable on the grounds of duress if a party's manifestation of assent is induced by an improper threat that leaves no reasonable alternative.") (emphasis added) (citing Restatement (Second) of Contracts § 175 (1981)). However, "[t]hreats to do what one may lawfully do [are] not duress." Heald v. Crump, 215 P. 140, 141 (Colo. 1923).

In the present case, there is no evidence to indicate Coors "threatened" employees with downsizing or outsourcing in the manner Colorado law requires for duress. Moreover, Coors was completely within its legal rights to downsize or outsource the security department; appellants' affidavits, claiming general uncertainty and unsettled circumstances in the security department, simply do not establish a legal claim of duress. The "pressures" that appellants and their experts allege are present any time an employee faces the difficult choice between accepting additional benefits or pursuing his legal rights. This alone does not indicate lack of free will. Finally, appellants were given the opportunity for reflection on their decisions for forty-five days, were given a seven-day period to revoke their acceptance, and were encouraged by Coors to consult legal counsel before signing the releases. There is simply no evidence from which a reasonable jury could conclude that the down-sizing, potential outsourcing, or general pressures in the security department subjugated the mind and will of the

19

appellants so that they could not properly execute the releases.

### c. Mutual Mistake

Finally, appellants argue that the releases were not knowing and voluntary because of a mutual mistake. Appellants contend that if, as Coors argues, the releases cover all of the claims raised by appellants in this lawsuit, then there was a "mutual mistake" and the releases were therefore not knowing and voluntary. Appellants argue that the mistake was that they believed they were only giving up claims that had already accrued. However, Coors agrees with the appellants that the releases only apply to claims that had already accrued. Therefore, there is no mutual mistake on this point. Rather, appellants' true dispute is over the scope of the releases which, as discussed below, cover appellants' ADEA claims.

### 2. Scope of the Releases

Appellants argue that, even if the releases are valid, their ADEA claims do not fall within the scope of the releases. We disagree. The relevant part of the releases states:

> You agree fully and forever to release all of your legal rights and claims against Coors, whether or not presently known to you, including future legal rights and claims,     <u>if based on acts or omissions occurring before you deliver this signed Agreement to the Benefits Department </u>, in any way relating to your employment with Coors, including your separation from employment . . . .

20

Aplts' App., vol. I, at 89 (emphasis added).

Appellants argue that the releases do not bar their ADEA claims because the claims arose after they signed the releases. After appellants signed and delivered the releases to the benefits department, there was a seven-day revocation period before the releases became effective during which time appellants continued to work for Coors. Appellants argue that their ADEA claims accrued after they signed the releases, at the end of the seven-day revocation period when the releases became effective and appellants were "discharged" from Coors. Thus, they argue that their claims are not covered by the releases, because they were "discharged" seven days after they signed and delivered the releases.

Coors argues that the releases, by their clear terms, reach all claims relating to appellants' employment and separation from Coors. They argue that the releases, under their express terms, clearly apply to all claims "in any way relating to [appellants'] employment with Coors, including [appellants'] separation from employment." Aplts' App., vol. I, at 89. Further, the releases specifically include any claim for discrimination on the basis of age under the ADEA. See id.

Under Colorado law, "interpretation of the language of a contract is a question of law to be resolved by the court." Denver Ctr. for the Performing Arts v. Briggs, 696 P.2d 299, 306 (Colo. 1985). "[W]hether . . . a contract is ambiguous is also a question of law for the court." Id. However, "[t]he fact that

21

the parties disagree as to the meaning of the terms of the contract does not lead necessarily to the conclusion that the contract is ambiguous." Id. "In ascertaining whether certain provisions of a document are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement." Radiology Prof'l Corp. v. Trinidad Area Health Assoc., 577 P.2d 748, 750 (Colo. 1978). "The plain effect of a contract should not be destroyed by strained construction." Briggs, 696 P.2d at 306.

We agree with the district court that the plain meaning of the releases is to release any claims in any way relating to appellants' employment with Coors, which includes appellants' ADEA claims. "[I]t is a cardinal rule that an agreement . . . must be construed as a whole and effect given, if possible, to its every provision." Brown v. Brown, 419 P.2d 444, 445 (Colo. 1966). "[S]pecific terms and exact terms [in this case, the specifically listed ADEA claims] are given greater weight than general language." Restatement (Second) Contracts § 203(c) (1981). The releases specifically address any claims for discrimination based on age under the ADEA. Appellants' literal, out-of-context interpretation of a single, general sentence would destroy the plain meaning of the agreements and would, in effect, remove the specifically listed ADEA claims from the releases. The releases, when interpreted as a whole, have only one reasonable meaning – to bar

22

all claims in any way relating to appellants' employment and discharge from Coors, specifically including appellants' ADEA claims. Therefore, we affirm the conclusion of the district court and hold that appellants' ADEA claims are barred by the unambiguous terms of the releases.

### 3. Tender Back

The district court held in the alternative that, even if the releases were not knowing and voluntary, appellants ratified the releases and could not challenge their validity because they did not "tender back" or return the severance benefits they received from Coors before bringing suit. Colorado law provides that "[o]ne seeking to remedy fraudulent inducement of a contract must elect either to rescind the entire contract to restore the conditions existing before the agreement was made, or to affirm the entire contract and recover the difference between the actual value of the benefits received and the value of those benefits if they had been as represented." Trimble v. City & County of Denver, 697 P.2d 716, 723 (Colo. 1985).

> If one elects to affirm the agreement, after full knowledge of the truth respecting the false and fraudulent representations, and thereafter continues to carry it out and receive its benefits, he may not thereafter maintain an action in damages for deceit, because this would constitute ratification of the agreement and a condonation of the fraud; otherwise one might, with knowledge of fraud, speculate upon the advantages or disadvantages of an agreement, receive its benefits, and thereafter repudiate all its obligations.

23

<u>Tisdel v. Central Sav. Bank & Trust Co.</u>, 6 P.2d 912, 918 (Colo. 1931) (emphasis added). Thus, under Colorado law, Coors argues that appellants are precluded from raising the issue of whether the releases were knowing and voluntary and would have had to return their severance benefits before they could challenge the validity of the releases.

In the context of ADEA claims, however, federal law has abrogated this common law doctrine through Congress' policy decision requiring heightened protection for older workers, implemented in the OWBPA. <u>See</u> <u>Oubre v. Entergy Operations, Inc.</u>, 118 S. Ct. 838, 841-42 (1998). In <u>Oubre</u>, an opinion decided during the pendency of this appeal, an employee who, as part of a termination agreement, signed a release of all claims against the employer in exchange for severance pay, subsequently sued the employer for age discrimination in violation of the ADEA. The employer argued that the employee had ratified the release by failing to return the monies she had received. The Supreme Court specifically rejected this argument, holding that an employee's failure to tender back benefits could not act as a ratification for a release of an ADEA claim that is void under the OWBPA. The Court stated that "[t]he statutory command is clear: An employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements." <u>Id.</u> at 841. The Court went on to say:

> The OWBPA governs the effect under federal law of waivers or releases on ADEA claims and incorporates no exceptions or

24

qualifications. The text of the OWBPA forecloses the employer's defense [requiring tender back] notwithstanding how general contract principles would apply to non-ADEA claims. The rule proposed by the employer would frustrate the statute's practical operation as well as its formal command. In many instances a discharged employee likely will have spent the monies received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, knowing it will be difficult to repay the monies and relying on ratification. We ought not to open the door to an evasion of the statute by this device.

Id. at 842 (emphasis added).

Oubre is dispositive in the present case. Coors cannot assert that the appellants' failure to tender back their separation benefits acted as ratification for releases that are allegedly void under the OWBPA. The Supreme Court acknowledged that, as a result of its decision, a release may be effective as to some claims (in this case appellants' state law claims), while ineffective as to the ADEA claims. See id. (noting that the restitution, tender back, and ratification issues "become complex where a release is effective as to some claims but not as to ADEA claims"). Thus, in the present case, while the appellants' failure to tender back their severance benefits can act as a ratification of the waiver as to their state law claims, see discussion of state law claims, infra, it has no effect on their ability to challenge the waivers of their ADEA claims under the OWBPA.

## 4. Untimeliness

In addition to the reasons articulated by the district court, Coors argues that

25

appellants' ADEA claims are barred by 29 U.S.C. 626(d)(2). Section 626(d)

provides, in pertinent part, that:

> No civil action may be commenced by an individual under this
> section until 60 days after a charge alleging unlawful discrimination
> has been filed with the Equal Employment Opportunity Commission.
> Such a charge shall be filed--
>   (1) within 180 days after the alleged unlawful practice occurred; or
>   (2) in a case to which section 633(b) of this title applies, within 300
> days after the alleged unlawful practice occurred, or within 30 days
> after receipt by the individual of notice of termination of proceedings
> under State law, whichever is earlier.

Subsection (b)(2) extends the time period to 300 days if section 633(b) applies.

Section 633(b) applies to states that have statutorily prohibited age discrimination.

Here, 633(b) applies because the State of Colorado has statutorily prohibited

employment discrimination on the basis of age, see Colo. Rev. Stat. § 24-34-402,

and, therefore, the 300-day limitation period of subsection (d)(2) applies in this

case. See 29 U.S.C. § 633(b).

The appellants accepted their benefit packages and resigned from Coors

between September 8 and October 28, 1993. Coors argues that the latest date that

any of the appellants could have been "constructively discharged" was November

5, 1993 – the last date the seven-day revocation period ended for any of the

appellants. Using November 5, 1993, as the latest possible date for the alleged

unlawful practice by Coors, the 300-day filing period mandated by 29 U.S.C.

626(d)(2) would have expired on September 1, 1994. Appellants (except Ms.

26

Simpson) filed their claims with the EEOC between September 7 and 16, 1994. Coors argues, therefore, that appellants' claims are untimely and barred by the statute because none of appellants filed charges with the EEOC before September 1, 1994.

In response, appellants first argue that their claims did not arise until January 31, 1994, the date that Coors allegedly hired its first replacement employee. Therefore, appellants had until November 27, 1994 (300 days from January 31, 1994) to file their claims with the EEOC. In the alternative, appellants argue that even if November 5, 1993 is the date on which their causes of action accrued, the 300-day filing period should be equitably tolled because Coors fraudulently concealed their ADEA claims.

Addressing appellants' first argument, we find that November 5, 1993 was the latest date on which their constructive discharge claims could have arisen. In Hulsey v. KMart, Inc., 43 F.3d 555, 557 (10th Cir. 1994), we held that a cause of action accrues under the ADEA on "the date the employee is notified of an adverse employment decision" by the employer. In Hulsey, the plaintiffs, two KMart employees, were demoted from their positions as store managers and transferred to different stores. Two years later, the plaintiffs viewed a television program, "A Current Affair," which purportedly revealed that their demotions were motivated by age discrimination. The plaintiffs thereafter filed suit and

27

argued that their cause of action did not accrue until the time that they watched

the television program. The court rejected this argument:

> A cause of action accrues under the Age Discrimination in Employment Act ("ADEA") on the date the employee is notified of an adverse employment decision. <u>Generally, an employee is notified of an adverse employment decision when a particular event or decision is announced by the employer</u>.
>
> It is undisputed that the allegedly discriminatory actions by Kmart against Employees were the demotions and transfers. As such, Employees' cause of action accrued on the dates Kmart notified them of their new assignments.

<u>Hulsey</u>, 43 F.3d at 557 (emphasis added) (quotations omitted) (further holding

that the plaintiffs' allegation of constructive discharge was not "sufficient to

invoke the doctrine of equitable tolling").

Applying <u>Hulsey</u>, we agree with Coors that the very latest date any of the

appellants' claims could be considered to have arisen was on November 5, 1993.

As stated by appellants, "[t]his is an employment discrimination case in which

[appellants] . . . allege that [Coors] violated the [ADEA] by constructively

discharging them because of their age." Aplts' Br. at 1. The allegedly

discriminatory action by Coors was the constructive discharge of appellants

because of their age. At the latest, this discharge occurred on November 5, 1993,

the last day the seven-day revocation period ended for any of the appellants.

While the hiring of new, younger employees might be evidence of Coors' alleged

28

discriminatory intent at the time appellants left Coors, it is the alleged discriminatory "discharge" that appellants seek to redress. Appellants admit as much when they state that their "claims are primarily based on misrepresentations made by Coors which occurred on October 12, 1993 (elimination of 9.36 FTEs), October 14, 1993 (outsourcing still being considered), and November 5, 1993 (concealment of discriminatory intent at time of termination)." Aplts' Reply Br. at 6-7. Thus, November 5, 1993 is the very latest date any of the appellants' constructive discharge claims could be considered to have arisen and none of the appellants filed an administrative claim within 300 days of this date.

Alternatively, appellants argue that even if their ADEA claims arose on November 5, 1993, the 300-day filing period should be equitably tolled because of Coors' fraudulent concealment of their claims. Equitable tolling, like equitable estoppel, "provide[s] for tolling of the statute of limitations when a plaintiff's unawareness of his ability to bring a claim -- either unawareness of the facts necessary to support a discrimination charge or unawareness of his legal rights -- is due to defendant's misconduct." Christopher v. Mobil Oil Corp., 950 F.2d 1209, 1215 (5th Cir. 1992). "It is well settled that equitable tolling of the ADEA . . . is appropriate only where the circumstances of the case rise to the level of active deception . . . where a plaintiff has been lulled into inaction by her past employer." Hulsey v. KMart, Inc., 43 F.3d at 557 (quotations omitted). "When

such deception is alleged on the part of an employer, the limitations period will not be tolled unless an employee's failure to timely file results from either a deliberate design by the employer or actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." Id. (quotations omitted). Equitable tolling "is not warranted where an employee is aware of all of the facts constituting discriminatory treatment but lacks direct knowledge of the employer's subjective discriminatory purpose." Christopher, 950 F.2d at 1216.

For example, in Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 (3d Cir. 1983), a case very similar to the present action, the court held that the 300 day limitation period could be equitably tolled. In Meyer, Mr. Joseph W. Meyer brought suit against Riegel Products Corporation, Inc., claiming age discrimination under the ADEA. Mr. Meyer had been dismissed from Riegel four years before he would be entitled to full pension benefits, when the company was purchased and reorganized by the James River Corporation. The Third Circuit held that Riegel's alleged misrepresentation, that Mr. Meyer had been dismissed as part of a reorganization, furnished grounds for equitable tolling. After stating the rules regarding equitable tolling discussed above, the court reasoned that "[g]iven plaintiff's allegations, either of these phenomena – [the alleged pretextual reorganization and the alleged surreptitious plan to replace plaintiff

30

with a younger worker] viewed in a light most favorable to plaintiff – could have caused him to temporarily defer filing with the Department of Labor." Id. at 307. Thus, the court concluded, Mr. Meyer "has surmounted his initial hurdle: alleging acts that, taken as alleged, could persuade a court to activate the doctrine of equitable tolling." Id. at 308.

Appellants' claims closely resemble the claims of Mr. Meyer. They claim that Coors' "reorganization" of the security department was a pretext to replace older workers with younger workers. Moreover, appellants claim that Coors actively deceived them by making fraudulent representations concerning the proposed downsizing and potential outsourcing. Thus, we conclude, as did the court in Meyer, that appellants have alleged acts that, taken as alleged, could persuade a court to activate the doctrine of equitable tolling. However, as with appellants' fraud claims, the record is not sufficiently developed to determine, as a matter of law, whether appellants were actively deceived. We therefore leave it to the district court to determine on remand whether "the circumstances of the case rise to the level of active deception," sufficient to invoke the doctrine of equitable tolling. Hulsey, 43 F.3d at 557.

### 5. Conclusion

Appellants' ADEA claims are remanded to the district court to consider

31

whether under the totality of the circumstances the waivers were valid in light of appellants' allegations of fraud. If the district court finds that the waivers were not knowing and voluntary (i.e., that there was fraud), then the waivers do not bar appellants' ADEA claims. The court must then determine whether equitable tolling under 29 U.S.C. § 626(d)(2) applies and, if so, whether appellants' filed their claims with in the required period. However, if the district court determines that the waivers were knowing and voluntary and that there was no fraud, then appellants' ADEA claims are barred by the unambiguous terms of the releases.

## B.     APPELLANTS' STATE LAW CLAIMS

In addition to their claims under the ADEA, appellants have asserted state law claims for wrongful discharge, outrageous conduct, negligent misrepresentation, and fraud. The district court held that appellants' state law claims were barred under the terms of the releases. In addition, the district court held that if the releases are invalid, appellants ratified the releases by failing to "tender back" their separation benefits and therefore could not challenge the validity of the releases. We agree that appellants are precluded from challenging the validity of the releases, as to the state law claims, because they failed to tender back their severance benefits. Further, we agree that appellants' state law claims are barred under the terms of the releases. Therefore, we affirm the holding of the

32

district court.

### 1. Ratification

As with their ADEA claims, appellants argue that the releases are invalid due to fraud. However, appellants did not return their separation benefits before bringing suit against Coors. As previously discussed, Colorado law provides that, in order to challenge the validity of a contract for fraud, a party "must elect either to rescind the entire contract to restore the conditions existing before the agreement was made, or to affirm the entire contract and recover the difference between the actual value of the benefits received and the value of those benefits if they had been as represented." Trimble v. City & County of Denver, 697 P.2d 716, 723 (Colo. 1985).

In the present case, appellants have affirmed the releases, after full knowledge of the "truth" respecting their allegation of fraudulent representations, by retaining their separation benefits. Appellants may not, under Colorado law, claim that they were fraudulently induced into signing the releases. To do so would allow appellants, "with knowledge of fraud, [to] speculate upon the advantages or disadvantages of [the releases], receive [the] benefits, and thereafter repudiate all its obligations." Tisdel v. Central Sav. Bank & Trust, 6 P.2d 912, 917-18 (Colo. 1931). Unlike appellants' ADEA claims, the OWBPA

33

does not prevent appellants from ratifying the releases as to their state law claims. The Supreme Court specifically noted in _Oubre_ that a release may be effective as to some claims but not as to the ADEA claims. _Oubre_, 118 S.Ct. at 842. That is the precise situation in this case.

By retaining their separation benefits, appellants have ratified the releases as to their state law clams. Consequently, the releases are effective as to appellants' state law claims, even if the releases were induced by fraud or other improper means. Accordingly, appellants are precluded from challenging the validity of the releases as to their state law claims.

### 2.      Scope of the Releases

Similar to their ADEA claims, appellants argue that the releases do not bar their state law claims because their state law claims accrued after they signed the releases, at the end of the seven-day revocation period when the releases became effective and appellants were "discharged" from Coors. However, like their ADEA claims, the releases specifically list the state law claims asserted by the appellants: "all common law rights and claims, such as breach of contract, express or implied, tort, whether negligent or intentional, wrongful discharge and any claim for fraud, omission or misrepresentation." Aplts' App., vol I, at 89. Again, appellants' strained construction of a single, general sentence would have

34

the effect of removing these specifically listed claims from the releases, destroying their plain meaning when interpreted as a whole. The releases have but one reasonable meaning – to bar all of appellants' state law claims. Therefore, we affirm the conclusion of the district court and hold that appellants' state law claims are barred by the unambiguous terms of the releases.

### 3. Conclusion

Appellants are precluded from challenging the validity of the releases because, under Colorado law, appellants failed to return their separation benefits before bringing suit against Coors. Further, appellants are contractually precluded from asserting their state law claims against Coors, under the clear, unambiguous terms of the releases. Therefore, we affirm the district court's grant of summary judgment in favor of Coors on appellants' state law claims.

### C. ATTORNEYS' FEES

Coors cross-appeals the trial court's ruling that they were not entitled to recover attorneys' fees under the terms of the releases. Specifically, the district court held that, while the releases provided that appellants would pay attorneys' fees if they brought a claim barred by the releases, those provisions contradict

Congress's policy of not providing attorneys' fees and costs to a defendant in an ADEA case. The court did not draw a distinction between appellants' ADEA claims and their state law claims. However, it appears from the record that the court believed that Coors could not recover attorneys' fees for the state law claims because of the same "federal policy." See Aplts' App., vol. IV, at 1544-47.

"In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975). This American rule, however, has several well-established exceptions, also set out in Alyeska. See id. at 257-59. Two of these exceptions are implicated in this case: (1) where the parties have entered a contract that shifts attorneys' fees and (2) where a statute provides for fee shifting. See id.

Coors argues that it is entitled to its attorneys' fees because the releases are enforceable contracts shifting attorneys' fees. The releases state: "[y]ou agree that, if you bring any kind of legal claim against Coors that you have given up by signing this Agreement, then you will be violating this Agreement and you must pay all legal fees, other costs and expenses incurred by Coors in defending against your claim." Aplts' App., vol. I, at 89.

In response, appellants argue that a defendant/employer may not recover attorneys' fees under section 626(b) of the ADEA. Section 626(b) incorporates

36

the remedial provision of the Fair Labor Standards Act, 29 U.S.C. § 216(b) (the "FLSA"), which provides that "[t]he court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). The appellants argue that under this language, which expressly provides for a *plaintiff* to recover attorneys' fees, it is implicit that a *defendant/employer* may not recover attorneys' fees for claims under the ADEA. They further argue that this "federal policy" reaches to appellants' pendent state law claims and preempts any state law contractual right to recover attorneys' fees.

First, it is unclear that appellants' initial premise – that a defendant/employer prevailing on a "released" ADEA claim may not receive attorneys' fees – is a correct statement of the law. While we have found no decision nor have the parties provided a decision that has specifically addressed *contractual* fee shifting under the ADEA, courts have generally held that the common law exceptions to the American rule apply to a defendant under the ADEA. For example, courts have specifically allowed defendants to recover attorneys' fees under Alyeska's "bad faith" exception. See, e.g., EEOC v. O & G Spring & Wire Forms Specialty Co., 38 F.3d 872, 883 (7th Cir. 1994) ("By explicitly changing [the American rule] with respect to plaintiffs but remaining silent with respect to defendants, the most sensible reading is that the FLSA and

37

the ADEA adopt the common law rule with respect to prevailing defendants.");

Gray v. New England Tel. & Tel. Co. , 792 F.2d 251, 260 n.1 (1st Cir. 1986) ("Under ADEA, an award of attorney's fees is only authorized for plaintiffs. However, defendants may obtain fees under Alyeska ." (citation omitted)).

However, we need not reach this issue. The district court must first determine on remand whether the releases are valid as to appellants' ADEA claims. As it is yet undetermined whether the releases are valid, and there is no prevailing party on appellants' ADEA claims, the issue of attorneys' fees for the ADEA claims is not ripe. We therefore decline to reach the issue.

However, assuming *arguendo* that appellants' initial premise is correct and there is some federal policy prohibiting defendants from recovering fees under the ADEA, there is nothing to indicate that *federal* policy should alter the common law rule regarding attorneys' fees for pendent *state* law claims. Contrary to appellants' argument, for which they present no authority, pendent jurisdiction over state law claims in a federal ADEA action does not generally preempt state law remedies. See, e.g. , Cancellier v. Federated Dep't Stores , 672 F.2d 1312, 1318 (9th Cir. 1982) ("The ADEA does not preempt the award of tort damages on pendent state claims."); Moody v. Pepsi-Cola Metro. Bottling Co., Inc. , 915 F.2d 201, 210 (6th Cir. 1990) ("[I]t is our best judgment that because there is no clear statement of Congressional intent to preempt, no requirement on any party to act

in accordance with state law at the risk of violating federal law, and nothing inherent in the nature of age discrimination which requires federal preeminence, this [emotional damages pendent state law claim] is not an appropriate case for preemption.").

In addition, the requirements for releases under the OWBPA do not restrict an employer's right to contract regarding attorneys' fees. Rather, the requirements are extensive and give employees every opportunity to understand the terms of the releases (like the specific fee shifting provision at issue here), including encouraging employees to consider the terms of the releases with the advice of counsel. See 29 U.S.C. § 626(f)(1)(A)-(H).

Finally, the conclusion that any federal policy concerning fee shifting does not extend to pendent state law claims is consistent with the Supreme Court's holding in Oubre. In Oubre, the Court declined to extend the "federal policy" of the OWBPA – extirpating the common law doctrine of "tender back" for ADEA claims – to pendent state law claims. Oubre, 118 S.Ct. at 842. Similarly, we decline to extend any federal policy regarding fees embodied in the ADEA to pendent state law claims.

Accordingly, we hold that, even if there is a federal policy preventing contractual fee shifting under the ADEA, the policy does not apply to pendent state law claims. In a suit containing a claim under the ADEA, an employer *may*

recover attorneys' fees pursuant to an "enforceable release" for any pendent state law claims.

On remand, the district court may, of course, still review Coors' claim for attorneys' fees as to pendent state law claims to determine if it is "inequitable and unreasonable." United States v. Western States Mech. Contractors, Inc., 834 F.2d 1533, 1548 (10th Cir. 1987). If the district court determines that Coors' fees are inequitable or unreasonable, "the trial court has discretion to deny or reduce the fee award." Id. at 1549.


### III. CONCLUSION

The district court's grant of summary judgment on appellants' ADEA claims is REVERSED and REMANDED to the district court to consider whether, under the totality of the circumstances, the releases are valid in light of appellants' allegations of fraud. Further, the district court's grant of summary judgment on appellants' state law claims is AFFIRMED. Finally, the district court's denial of Coors' motion for summary judgment on its cross-appeal for attorneys' fees is VACATED and REMANDED to the district court for further proceedings in accordance with this opinion.