**Donald E. PHILLIPS, Plaintiff,**

v.

**Dr. Meredith A. MOORE and Washburn University, Defendants.**

**No. 00–2424–JWL.**

United States District Court, D. Kansas.

Oct. 1, 2001.

---

James L. Wisler, Neil A. Dean, Schroer, Rice, P.A., Topeka, KS, for plaintiff.

Michael T. Jilka, Wendell F. Cowan, Jr., Shook, Hardy & Bacon L.L.P., Overland Park, KS, for defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Donald E. Phillips filed suit against defendant Washburn University, his former employer, alleging discrimination on the basis of sex (including sexual harassment) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., discrimination on the basis of age (including age-based harassment) in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., and retaliation in violation of both Title VII and the ADEA. He further alleges that both defendant Washburn University and defendant Dr. Meredith A. Moore, plaintiff's supervisor, deprived him of certain property interests in violation of 42 U.S.C. § 1983. Finally, plaintiff asserts that both defendants are liable for defamation under Kansas law.

This matter is presently before the court on defendant's motion for summary judgment (doc. # 30). As set forth in more detail below, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed in its entirety.

## I. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff was hired in 1986 as an assistant professor for the Center for Media and Communication Studies Department at Washburn University. He became a ten-ured professor in 1989. Dr. Meredith Moore is the current chairperson of the Communications Department at Washburn and she has held that position since 1992. From 1992 through 1995, plaintiff had no significant complaints about the way he was treated by Dr. Moore.

In March 1996, plaintiff received an "unsatisfactory" performance evaluation from Dr. Moore with respect to the 1995 calendar year.[1] According to Dr. Moore, plaintiff spent too much time in the library in lieu of classroom instruction, had poor student evaluations, and spent little time advising students. Two months later, Dr. Moore sent plaintiff a memo regarding his excessive number of library days and also expressed concern about plaintiff's teaching effectiveness.

In March 1997, plaintiff received an "unsatisfactory" evaluation from Dr. Moore with respect to the Spring 1996 semester.[2] In July 1997, Dr. Moore received a memo from Karen Ray, Dean of the College of Arts and Sciences, regarding the declining enrollment in plaintiff's courses. Dean Ray stated in the memo, "Some majors will not take [course] 361, even if it delays graduating, because Dr. Phillips is the instructor." During that same time period, Dr. Moore sent plaintiff a memo regarding her "on-going concerns with [plaintiff's] teaching evaluations." In August 1997, Dr. Moore sent plaintiff a memo urging him to improve his classroom performance. Dr. Moore advised plaintiff that his poor student evaluations and the lack of enrollment in his classes indicated that "the students do not feel intellectually challenged" and feel that they are not given the necessary assistance. Dr. Moore shared her concerns about plaintiff's per-

1. Plaintiff received annual evaluations by the Department Chairperson.

2. His March 1997 evaluation was not based on the Fall 1996 semester as plaintiff was on academic sabbatical in London during that time.

formance with Dean Ray, who informed her that she shared similar concerns. For example, Dean Ray noticed in 1997 that plaintiff's effective teaching scale scores were significantly lower than most other members of the college. Moreover, according to exit interviews of students in the spring semester of 1997, 49% of plaintiff's students indicated that they did not find him an effective teacher and only 51% reported that they were intellectually challenged. On October 9, 1997, Dean Ray sent a memo to plaintiff expressing her concern regarding his teaching effectiveness and his lack of service within the department.[3] Dean Ray cautioned plaintiff in her memo that if she did not see "substantial improvement," she was prepared to take "additional action in this situation."

On January 29, 1998, plaintiff sent a memo to Dr. Moore and Dean Ray proposing that he take early retirement. The next week, he received an "unsatisfactory" performance evaluation from Dr. Moore with respect to the 1997 calendar year. In that evaluation, Dr. Moore expressed "serious concern" about plaintiff's performance in the areas of teaching, research and service. Dr. Moore noted that "for the third year, his activity report demonstrates unsatisfactory performance."

On April 22, 1998, the University approved plaintiff's request for early retirement and plaintiff signed a Phased Retirement Agreement on the same day. Pursuant to that agreement, plaintiff agreed to release any and all claims against the University and its officers, agents and employees. Moreover, pursuant to the agreement, plaintiff accepted a reduced salary and course load for the next two years. At the end of the two-year period, plaintiff's resignation was deemed effective. Plaintiff was 56 years old at the time of his resignation.

In February 1999, plaintiff received a "satisfactory" performance evaluation from Dr. Moore for the 1998 calendar year. Three months later, in May 1999, plaintiff filed a charge of discrimination with the Kansas Human Rights Commission.

Additional facts will be provided as they pertain to plaintiff's particular claims.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement

---

**3.** Dean Ray's concern about plaintiff's lack of service was based in part on a memo that Dr. Moore received from another professor in the Communications Department expressing his frustration over the unfair division of work and plaintiff's lack of participation in the functioning of the department. The particular professor questioned plaintiff's ability to contribute meaningfully in department discussions and his ability to complete even the most simple of the tasks the department's search committee needed performed.

to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

### III. The Release Executed by Plaintiff

■ Before turning to the merits of plaintiff's particular claims, the court must first resolve whether plaintiff's Title VII, section 1983 and defamation claims[4] are barred by the release signed by plaintiff in connection with the Phased Retirement Agreement. Plaintiff concedes that he initiated the idea of his early retirement, that he wrote a memo to Dean Ray and Dr. Moore proposing that he take early retirement, and that he signed the Phased Retirement Agreement on April 22, 1998. He further concedes that he read the entire agreement and understood it. Plaintiff now contends, however, that the agreement and release was not knowing and voluntary because he was under duress at the time he executed the agreement and release. Specifically, plaintiff claims that he believed that he had "no other choice" but to retire because he perceived that his job was in jeopardy in light of his negative performance evaluations and Dean Ray's October 1997 letter in which she stated that she was "prepared to take additional action" if she did not see substantial improvement in plaintiff's performance.

■ In enacting Title VII, Congress evinced a "strong preference for encouraging voluntary settlement of employment discrimination claims." *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). Consistent with this preference, the Tenth Circuit has long recognized that an employee may waive potential employment discrimination claims by agreement so long as the employee's waiver of such claims is knowing and voluntary. *See, e.g., Torrez v. Public Serv. Co. of N.M., Inc.,* 908 F.2d 687, 689 (10th Cir.1990). If the employee's waiver is knowingly and voluntarily made, the agreement will be enforced absent the typical exceptions for fraud, duress, lack of consideration or mutual mistake. *See id.; accord Bennett v. Coors Brewing Co.,* 189 F.3d 1221, 1229 (10th Cir.1999).

In support of its argument that plaintiff cannot establish his claim of duress, defen-

---

4. Defendant concedes that the release signed by plaintiff did not fully comply with the provisions of the Older Workers Benefit Pro-

tection Act, 29 U.S.C. § 626(f)(1), and, thus, that the release does not vitiate plaintiff's ADEA claims.

dant directs the court to two Tenth Circuit cases addressing analogous facts-the *Bennett* case cited above and *White v. General Motors Corp.*, 908 F.2d 669 (10th Cir.1990). In *Bennett*, the plaintiffs worked in the security department at Coors. *See* 189 F.3d at 1225. In 1993, Coors announced that it would reduce its workforce and sought to achieve this reduction through voluntary severance and attrition. *Id.* It created two early retirement programs to facilitate this goal. *Id.* Eligible employees in the security department were given the option of participating in these programs. *Id.* Coors also evaluated the possibility of completely outsourcing the security department. *Id.* The plaintiffs were aware of the rumors of potential outsourcing at the time they were considering whether to accept the early retirement packages, but Coors informed the plaintiffs that no decision had been made whether to outsource the security department. *Id.* Subsequently, Coors announced that it intended to eliminate several full-time employees from the department. *Id.* Thereafter, the plaintiffs accepted the early retirement packages and each plaintiff signed a release in connection with that package. *Id.*

Shortly after the plaintiffs accepted the early retirement packages, Coors ran an advertisement in the Denver Post seeking full-time employees for its security department and, as a result of these ads, hired new personnel for the department. *Id.* at 1226. The plaintiffs thereafter filed claims of age discrimination. *Id.* at 1227. The district court granted Coors' motion for summary judgment on the grounds that plaintiffs' claims were barred under the plain language of the releases. *Id.* On appeal, the Tenth Circuit held that the plaintiffs failed to establish a prima facie claim of duress. *Id.* at 1229, 1230–31.[5] Specifically, the circuit rejected the plain-

tiffs arguments that they had no choice but to accept the early retirement packages in light of Coors' threats of outsourcing the security department. Analyzing the plaintiffs' claim of duress under Colorado law (which, as shown below, mirrors Kansas law), the circuit concluded that the facts simply did not indicate a "lack of free will" on the part of the plaintiffs. *See id.* at 1231. As the court noted:

> The "pressures" that appellants and their experts allege are present any time an employee faces the difficult choice between accepting additional benefits or pursuing his legal rights. This alone does not indicate lack of free will. Finally, appellants were given the opportunity for reflection on their decisions for forty-five days, were given a seven-day period to revoke their acceptance, and were encouraged by Coors to consult legal counsel before signing the releases. There is simply no evidence from which a reasonable jury could conclude that the down-sizing, potential outsourcing, or general pressures in the security department subjugated the mind and will of the appellants so that they could not properly execute the releases.

*Id.*

The Tenth Circuit reached a similar result in *White*, a case in which the court applied Kansas law to a claim of duress. In *White*, the plaintiffs were supervisors at a General Motors plant in Kansas City, Kansas. *See* 908 F.2d at 670. Their employment was terminated under GM's Special Incentive Separation Program (SISP) under which they received certain payments and benefits in exchange for releasing all claims. *Id.* The plaintiffs subsequently filed claims for wrongful discharge, breach of contract and slander. *Id.* GM filed a motion for summary judgment, arguing that the plaintiffs' claims

---

**5.** The circuit, however, remanded the case on the issue of whether the releases were valid in

light of plaintiffs' allegations of fraud. *Id.* at 1230.

were barred by the terms of the releases. *Id.* at 671. The district court granted the motion. *Id.*

On appeal, the plaintiffs argued that the releases were executed under duress because their supervisors at GM gave them two choices-either accept the terms of the SISP or be terminated with no benefits. *Id.* Looking to Kansas law, the circuit rejected the plaintiffs' arguments:

> While Kansas recognizes duress when one party, by a threat, deprives another of that free will essential to the formation of a legal contract, it is clear that not all threats, even if unlawful, will give rise to a defense of duress. [*Hastain v. Greenbaum,* 205 Kan. 475, 470 P.2d 741, 746 (1970) ]. The Kansas Supreme Court stated that "a transaction cannot be held to have been induced by duress, *notwithstanding any threats which may have been made,* where the party had and took an opportunity for reflection and for making up his mind, and where he consulted with others and had the benefit of their advice, especially where he was advised by his counsel." *Id.,* 470 P.2d at 748 (quoting 1 *Black on Recission and Cancellation,* 2d ed., § 223 at 630–31) (emphasis added). It is undisputed that plaintiffs in the instant case took two weeks off with pay to consider the offer, during which time they consulted with each other, with GM officials, with other offerees, and with an attorney. . . . [W]e think [the Kansas Supreme Court] would hold that there was not enough to go to a jury on the duress issue in this case.

*Id.* at 673.

The court agrees with defendant that *Bennett* and *White* dictate the conclusion

that plaintiff's claim of duress cannot withstand summary judgment. Plaintiff himself first proposed the idea of taking early retirement in January 1998. He did not sign the agreement until April 1998. Thus, he had at least three months to consider whether he really wanted to accept early retirement. In addition, under the terms of the agreement, plaintiff was given seven days to revoke his acceptance after he executed the release and agreement. ·Moreover, although he apparently decided not to do so, plaintiff, by signing the agreement, represented that he had been advised in writing by defendant to consult with an attorney about the contents of the agreement. Finally, in contrast to the plaintiffs in *Bennett* and *White* who knew that their employers were considering downsizing their departments or otherwise terminating their employment, plaintiff here only guessed that his job was in jeopardy. He never discussed his fears with Dr. Moore, Dean Ray, or anyone else and defendant had taken no steps whatsoever to initiate the process of terminating plaintiff-a tenured professor at a public university.

In short, no reasonable jury could conclude that defendant, by giving plaintiff negative performance evaluations and suggesting that it was prepared to take "additional steps" if plaintiff's performance did not improve, deprived plaintiff of "that free will essential to the formation of a legal contract." Plaintiff's claim of duress is without merit and the release bars plaintiff's claims under Title VII and section 1983 and his state law claim for defamation.[6]

6. As set forth in more detail below, even assuming plaintiff's release did not bar his Title VII sexual harassment, gender discrimination and retaliation claims or his defamation claim, the court would nonetheless grant summary judgment on the merits of those claims.

## IV. Hostile Work Environment

While it is not entirely clear from his papers, plaintiff appears to assert claims of age harassment and sexual harassment against defendant Washburn. Because the release executed by plaintiff bars his Title VII sexual harassment claim, the court need only address the merits of plaintiff's age-related hostile work environment claim.[7] For an age-related hostile work environment claim to survive summary judgment, plaintiff "must show under the totality of the circumstances that the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and the harassment stemmed from ... age-related animus." *See Holmes v. Regents of the University of Colorado,* 1999 WL 285826, at *7 (10th Cir.1999) (citing *Bolden v. PRC Inc.,* 43 F.3d 545, 550–51 (10th Cir.1994)). For purposes of evaluating whether an environment is sufficiently hostile or abusive, the court looks to all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Applying these principles, the court easily concludes that plaintiff's allegations fall far short of showing age-related harassment. The court begins with plaintiff's contention that he has come forward with direct evidence of an age-based policy of discrimination at Washburn. In sup-

port of this bold statement, plaintiff refers the court to two pieces of evidence. The first is a comment allegedly made by Washburn University President Jerry Farley during the General Faculty Meeting at the start of the fall semester in 1998. According to plaintiff, President Farley, in discussing the need to improve salaries to attract new faculty, said "something to the effect that 'it's not the 50 year olds who are already here that we have to worry about.'" Plaintiff, however, has failed to provide any additional information for the court to understand the context of the alleged statement or to broaden any inferences of the statement. *See Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1457 (10th Cir.1994) (no inference of discrimination permissible from decisionmaker's statement that "he has so many protected people he couldn't really do his job" where plaintiff failed to provide context of statement); *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994) (no inference of age discrimination permissible from decisionmaker's statement that "long-term employees have a diminishing return" where plaintiff failed to provide context of statement). In the absence of such information, no reasonable jury could conclude, based on this comment, that defendant had a policy of age discrimination.

The second piece of evidence offered by plaintiff in support of his claim that defendant had a "policy" of age discrimination is a portion of Dean Ray's "Annual Chairperson Performance Review" of Dr. Moore for the 1997 calendar

---

7. The issue of whether a hostile environment claim is actionable under the ADEA remains unsettled in the Tenth Circuit. *See Holmes v. Regents of the University of Colorado,* No. 98–1172, 1999 WL 285826, at *7 n. 6 (10th Cir. May 7, 1999). Although the circuit has not expressly recognized a cause of action for hostile work environment under the ADEA, it has considered a case where the plaintiff

raised the issue. *Id.* (citing *McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1129 (10th Cir.1998)) (considering and deciding a hostile work environment claim under the ADEA, but not addressing the apparent lack of authority for raising such a theory). For purposes of this case, the court assumes without deciding that plaintiff may advance a hostile work environment claim under the ADEA.

year and dated February 27, 1998. In that review, Dean Ray writes:

> Meredith has led her department in a number of changes this year including hiring an excellent new faculty member and completing a major curriculum revision. With the impending retirement of one remaining "old guard" faculty, this department should become a very cohesive and productive unit.

While the meaning of Dean Ray's "old guard" reference is unclear (indeed, neither party elaborates on or attempts to explain the reference), the statement nonetheless fails to create a fact issue on plaintiff's claim for at least two reasons. First, to the extent the comment is offered in an attempt to buttress plaintiff's age-based harassment claim, it is not relevant because there is no evidence that plaintiff was aware of Dean Ray's comment at the relevant time. *See Hirase–Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir.1995) (plaintiff "may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment"). Second, to the extent the comment is offered in an attempt to show that plaintiff was the victim of an age-based policy of discrimination, there is simply insufficient evidence in the record, as discussed in other parts of this opinion, to suggest that plaintiff retired under duress or that he suffered any adverse employment action at the hands of defendant.

Significantly, the remainder of the evidence plaintiff proffers is nothing more than a collection of unrelated and infrequent incidents of conduct by Dr. Moore and Dean Ray that he subjectively construes as acts motivated by age-related animus. His list of grievances includes none of the age-related comments or ridicule that are hallmarks of hostile work environment claims. *See Holmes*, 1999 WL 285826, at \*7. For example, plaintiff complains that when he was on sabbatical in London in the fall of 1996, Dr. Moore removed a textbook from his office. It is uncontroverted that Dr. Moore took the textbook-a book that had been provided to plaintiff by the publisher at no charge-because the department needed an extra copy for an adjunct professor. When plaintiff returned from his sabbatical, Dr. Moore was unable to locate his copy of the textbook despite making efforts to do so. Plaintiff received a new copy of the textbook at no charge. Somehow, plaintiff construes these facts as "evidence of the heightened scrutiny to which he felt subjected and was subjected." These facts, however, are totally devoid of any age-related animus on the part of Dr. Moore.

Similarly, plaintiff complains about Dr. Moore's response to an e-mail message that he sent to her during the fall of 1998. Plaintiff stated in his e-mail that he would have to miss his final exam because of emergency eye surgery. In reply, Dr. Moore simply stated, "okay." While plaintiff concedes that Dr. Moore's "laconic" response is facially neutral, he alleges that her response "evidences how ostracized [he] felt and was." Even assuming, however, that plaintiff was ostracized from the department, plaintiff has come forward with no evidence suggesting that he was ostracized because of his age. Simply put, Dr. Moore's response in no way suggests that she harbored an age-based animus toward plaintiff.

Plaintiff also alleges that he was "moved and moved again from office to office" in the summer of 1998 until he was "relegated to a copy room quickly turned into an inadequate office." Although plaintiff claims that he felt "ridiculed" because of his office situation, he offers no evidence that he was forced to move offices because of some age-based animus on the part of his superiors. Rather, the evidence shows

that he was initially forced to move offices because his application for early retirement had just been granted and he was only teaching part-time. His office, then, was given to a faculty member who was teaching full-time. Two months later, Vice President Sheley informed Dr. Moore that plaintiff's "new" office was needed for administrative purposes. It is uncontroverted that Dr. Moore expressed to Vice President Sheley her belief that moving plaintiff to another office was a bad decision. Dr. Moore's opposition failed to dissuade her superior and plaintiff was forced to move again. Plaintiff does not even allege that Vice President Sheley bore any age-based animus toward him or anyone else.

Finally, plaintiff contends that his 1996, 1997 and 1998 performance evaluations are arbitrary and reveal Dr. Moore's age bias. Specifically, plaintiff contends that Dr. Moore "injected" her age bias into plaintiff's evaluations. Aside from his own subjective belief of Dr. Moore's age bias, however, plaintiff offers no evidence to suggest that Dr. Moore harbored an age-related animus toward plaintiff and that such animus was reflected in his evaluations. *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1408 n. 7 (10th Cir.1997) ("[S]ubjective belief of discrimination is not sufficient to preclude summary judgment."). Moreover, plaintiff has offered no evidence (again, other than his own subjective beliefs) that Dr. Moore was not genuinely concerned about plaintiff's performance, even though her concerns may have been misguided in plaintiff's perception. *See Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1209 (10th Cir.1999) (noting that it is the manager's perception of the employee's performance, and not the employee's

subjective evaluation of her performance, that is relevant in determining pretext).

■ In conclusion, the court emphasizes that our federal employment laws are not intended to remedy every instance of interpersonal conflict occurring in the workplace-only those motivated by improper discriminatory purposes. *See Holmes,* 1999 WL 285826, at *8. Plaintiff may well have endured unhappiness with his job and he may well have believed that Dr. Moore's treatment of him was insensitive and unfair. No matter how unpleasant plaintiff found his professional relationship with Dr. Moore and his resulting work environment, unless he shows it is charged with age-related animus, his case simply does not rise to the level of creating a legally redressable hostile work environment claim. In short, after carefully reviewing plaintiff's allegations, the court finds those allegations legally insufficient to create a jury question and survive summary judgment.[8]

## V. Age Discrimination

Plaintiff next asserts that defendant Washburn discriminated against him on the basis of his age by constructively discharging him and by providing him with negative performance evaluations. The basic allocation of burdens for a disparate treatment claim is set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1315 (10th Cir.1999). Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of discrimination, which in an ADEA case requires him to show that

---

**8.** In large part, plaintiff's allegations of Title VII sexual harassment mirror his allegations of age-based harassment. Thus, even assuming the release executed by plaintiff did not bar his sexual harassment claim, the court would nonetheless grant summary judgment on the merits of that claim for the same reasons set forth in connection with plaintiff's age-based harassment claim.

(1) he is a member of the class protected by the statute; (2) he suffered an adverse employment action; (3) he was qualified for the position at issue; and (4) he was treated less favorably than others not in the protected class. *See id.* at 1315–16 (citing *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir.1998)). If he establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* at 1316 (citing *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817). If defendant offers a legitimate, nondiscriminatory reason for its actions, the burden reverts to plaintiff to show defendant's proffered reason was a pretext for discrimination. *Id.* (citing McDonnell Douglas, 411 U.S. at 804–05, 93 S.Ct. 1817).

■ In support of its motion for summary judgment, defendant contends that plaintiff's age discrimination claim fails as a matter of law because he cannot show that he suffered any adverse employment action. In response, plaintiff asserts that he was constructively discharged from his employment and that his negative performance evaluations constitute "adverse employment actions" under the liberal definition of that phrase embraced by the Tenth Circuit. *See Jeffries v. State of Kansas,* 147 F.3d 1220, 1231–32 (10th Cir.1998). As set forth in more detail below, plaintiff has failed to create a jury issue on his claim of constructive discharge and he has not established sufficient facts demonstrating that his performance evaluations constitute adverse employment actions even under the Tenth Circuit's standard.

■ A constructive discharge occurs when "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sanchez v. Denver Public Schs.,* 164 F.3d 527, 534 (10th Cir.1998)

(citing *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986)). Summary judgment on plaintiff's constructive discharge claim is appropriate for at least two reasons. First, because the court has concluded elsewhere in this opinion that defendant did not commit any "illegal discriminatory acts" and is entitled to summary judgment on plaintiff's other claims, the court must grant summary judgment in favor of defendant on plaintiff's constructive discharge claim. *See Perez v. Interconnect Devices Inc.,* No. Civ.A. 97–2194–GTV, 1998 WL 781220, at *12–13 (D.Kan. Oct.22, 1998), *aff'd,* 189 F.3d 478 (10th Cir.1999). Second, having rejected plaintiff's claim of duress in connection with the release executed by plaintiff, the court has concluded that plaintiff voluntarily resigned his employment with defendant. *See Orback v. Hewlett–Packard Co.,* 97 F.3d 429, 433–34 (10th Cir.1996) (no evidence to support inference of constructive discharge where plaintiffs "left voluntarily, availing themselves of the benefit of a severance package in exchange for their resignations"). Summary judgment, then, is granted on plaintiff's constructive discharge claim.

■ Similarly, plaintiff has failed to raise a genuine factual dispute on the question of whether his negative performance evaluations constituted an "adverse employment action." As an initial matter, plaintiff correctly notes that the Tenth Circuit liberally defines "adverse employment action." *See Jeffries,* 147 F.3d at 1232. Specifically, the circuit has declined to adopt a "materiality" requirement and, rather, takes a "case by case approach" to determining whether a given employment action is "adverse." *See id.* Moreover, the circuit has held, albeit in an unpublished opinion, that negative performance evaluations can constitute adverse employment action in certain circumstances. *See Toth v. Gates Rubber Co.,* No. 99–1017, 2000 WL 796068, at *9 (10th Cir. June 21, 2000). In *Toth,* the circuit held that the

plaintiff suffered an adverse employment action for purposes of her Title VII retaliation claim when she received negative performance evaluations *that ultimately resulted in her discharge. See id.* In other words, because those performance evaluations had an "adverse impact on [plaintiff's] future employment opportunities," they were sufficient to constitute adverse employment actions. *See id.* By contrast, plaintiff has not shown that his negative performance evaluations had any bearing whatsoever on his job status. He remained a tenured professor. He continued to receive salary increases. And while Dean Ray warned plaintiff that she was prepared to take "additional steps" if his performance did not improve, no steps were ever taken or even initiated. Plaintiff voluntarily resigned his employment. In such circumstances, plaintiff cannot demonstrate that his performance evaluations constituted adverse employment actions.

Having failed to demonstrate that he suffered any adverse employment action, plaintiff's age discrimination claim fails as a matter of law and summary judgment in favor of defendant is warranted on this claim.

## VI. Retaliation

▮ Plaintiff also contends that defendant Washburn retaliated against him after he filed a charge of discrimination on

May 6, 1999.[9] As plaintiff concedes that he has no direct evidence of retaliatory motive, the court analyzes plaintiff's retaliation claim under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See McGarry v. Board of County Commr's*, 175 F.3d 1193, 1201 (10th Cir.1999). To establish a prima facie case of retaliation, plaintiff must demonstrate that (1) he engaged in protected activity; (2) he suffered an adverse employment action subsequent to or contemporaneous with his protected activity; and (3) a causal connection exists between the protected activity and the adverse action. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir.2001) (citations omitted). Once plaintiff establishes his prima facie case, the burden shifts to defendant to articulate a legitimate, nonretaliatory reason for its actions. *See id.* If defendant meets its burden, then plaintiff must respond by showing that there is a genuine dispute of material fact as to whether defendant's asserted reasons for the challenged action are pretextual. *See id.*

Defendant maintains that plaintiff cannot satisfy the third element of his prima facie case of retaliation because defendant took no adverse employment action against plaintiff after May 6, 1999. Plaintiff does not dispute this fact in his papers.[10] There

---

9. To the extent plaintiff's retaliation claim is based on Title VII, the claim is waived pursuant to the release executed by plaintiff. Of course, even in the absence of the release, summary judgment would nonetheless be appropriate for the same reasons it is appropriate in connection with plaintiff's ADEA retaliation claim.

10. While plaintiff touches on his retaliation claim in his papers, it appears as though plaintiff either forgot to finish writing that section of his brief or simply "gave up." In any event, plaintiff, either intentionally or by

oversight, failed to finish his argument concerning his retaliation claim and, thus, never addressed the specific argument made by defendant. Because the court would not want to deprive plaintiff of his day in court simply because of an oversight by his counsel, the court undertook its own review of the record for evidence of any adverse action taken by defendant after May 6, 1999. The court found no evidence of any adverse action after May 6, 1999 and found no allegation made by plaintiff that any adverse action occurred after that time.

are no genuine issues of material fact on this claim. Summary judgment is granted in favor of defendant. *See Penry v. Federal Home Loan Bank,* 155 F.3d 1257, 1264 (10th Cir.1998) (affirming grant of summary judgment for defendant where the record failed to demonstrate that either of the plaintiffs suffered adverse employment action in connection with their complaints).

## VII. Gender Discrimination

Plaintiff claims that defendant Washburn discriminated against him on the basis of his sex by constructively discharging him and by providing him with negative performance evaluations. As set forth above, this claim is barred by the release executed by plaintiff. Even assuming, however, that plaintiff's claim was not barred, the court would nonetheless grant summary judgment in favor of defendant on this claim.

Plaintiff's sex discrimination claim requires an analysis that is somewhat modified from the *McDonnell Douglas* scheme. *See Reynolds v. School Dist. No. 1,* 69 F.3d 1523, 1534 (10th Cir.1995) (plaintiff claiming "reverse discrimination . . . does not necessarily deserve the presumption of discrimination afforded to a member of an ostensibly disfavored minority class"). Specifically, plaintiff, as a member of an historically favored group, must show "background circumstances [which] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *See Livingston v. Roadway Express, Inc.,* 802 F.2d 1250, 1252 (10th Cir.1986) (alteration in original) (citations omitted); *accord Reynolds,* 69 F.3d at 1534.

According to defendant, plaintiff simply has not set forth evidence demonstrating that defendant is that "unusual employer" that discriminates against men. Plaintiff concedes that Tenth Circuit precedent requires him to meet a heightened standard

of proof to resist summary judgment on his gender discrimination claim. He further concedes that he has not met this standard. In his papers, he "moves the court to reverse the Tenth Circuit's treatment of reverse discrimination cases," arguing that the current standard creates arbitrary barriers for persons with legitimate Title VII claims. The court, of course, is bound by circuit precedent. *See United States v. Spedalieri,* 910 F.2d 707, 709 & n. 2 (10th Cir.1990). In the absence of any other argument from plaintiff concerning the viability of his gender discrimination claim, the court would grant summary judgment on plaintiff's sex discrimination claim even if the claim had not been waived by plaintiff in the release. Moreover, as set forth above in connection with plaintiff's age discrimination claim, plaintiff has failed to show that he was subjected to any adverse employment action. For this reason, too, then, summary judgment would be appropriate on plaintiff's sex discrimination claim.

## VIII. Defamation

■ Finally, plaintiff claims that both defendants are liable for defamation. Again, this claim is barred by the release executed by plaintiff in connection with his early retirement package. Even if plaintiff had not waived this claim, however, the court would grant summary judgment in favor of defendant on the merits of the claim. Specifically, plaintiff contends that Dr. Moore made a defamatory comment in a handwritten note to Dean Ray. The note was written on a copy of an e-mail message sent by plaintiff to Dr. Moore concerning faculty publications. Because the content of plaintiff's e-mail message is helpful to understanding Dr. Moore's statement, the court recites plaintiff's message in its entirety. Plaintiff's message to Dr. Moore stated as follows:

As to your inquiry about the 10% ranking: it came from a study and article in The Chronicle of Higher Education back in the 80s which indicated that faculty who had four or more books published would be in the top 10% of those publishing books. Other faculty, of course, may use their talents in different ways and even in research may focus more on papers, articles, etc. I doubt that I can recover that particular article at this time (having accumulated extensive files and having had moves in-between then and now) but I do specifically recall the article which dealt with faculty publications. Thanks for your question.

Dr. Moore then passed a hard copy of plaintiff's message on to Dean Ray with the following handwritten notation:

When you need a chuckle, read this! I think Don and I had this discussion earlier, but anyway, I found this article in an SCA publication. I'm very sure it's the article he references. I'd think a former chair, debate coach, and world-class scholar would be able to read research more carefully than this. Maybe he should enroll in our SC 352 Reading Research class.

At the end of the last sentence of her note, Dr. Moore drew a "smiley face." Dr. Moore then attached to her note a copy of the article she referenced in her note.

 In support of its motion for summary judgment, defendant maintains that Dr. Moore's note contains no false statement but only pure opinion made in jest.[11] According to plaintiff, the last sentence of Dr. Moore's note (*i.e.*, "[m]aybe he should enroll in our SC352 Reading Research class") constitutes a false and defamatory statement because she never recommended that plaintiff sign up for course she references in her note. Under the

Restatement (Second) of Torts, a statement in the form of an opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion. *See* Restatement (Second) of Torts § 566 (1977). That is not the case here. Dr. Moore's note discloses the facts upon which she based her opinion. This is "pure opinion" in which "the maker of a comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character." *See id.*, cmt. b. As such, it is not actionable. *See id.*, cmt. c ("A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it .is."). For this reason, summary judgment would be appropriate on plaintiff's defamation claim even in the absence of the release. *See El–Ghori v. Grimes*, 23 F.Supp.2d 1259, 1269 (D.Kan.1998) (written statements of opinion made by tenured faculty professor to the Dean and Advisory Committee concerning plaintiff's qualifications, offered to persuade the Dean that he should not recommend plaintiff for tenure and promotion, were not actionable under § 566 of the Restatement (Second) of Torts; summary judgment in favor of defendants granted on defamation claim).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. # 30) is **granted** and plaintiff's complaint is dismissed in its entirety.

**IT IS SO ORDERED.**

---

11. Defendant also contends that Dr. Moore's statements are privileged under Kansas law. The court declines to address this argument in light of its conclusion that Dr. Moore's statements are simply not defamatory.